JAMES A. RANDALL v. THE EVENING NEWS ASSOCIATION AND MICHAEL J. DEE.

*Libel and slander—Pleading—Inducement—Innuendo—Libelous caricature.*

1. A picture, the *only* meaning of which is to show that the monument of a member of the Legislature should show that liquor and money was the source of his success in passing a particular bill, is libelous if not true.

2. It is libelous, if untrue, to state in a published article that a member of the Legislature (naming him) accomplished the passage of a particular bill by "keeping open house, with liquors," or that "he did it by the use of boodle."

3. It is the office of the inducement in a declaration for libel to narrate the extrinsic circumstances, which, coupled with the language published, affect its construction and render it actionable, where, standing alone, and not thus explained, the language used would appear either not to concern the plaintiff, or, if concerning him, not to affect him injuriously. It is a statement of the facts out of which the charge arises, or which are necessary or useful to make the charge intelligible.

4. If the meaning of the publication is plain, no innuendo is needed. The use of it can never change the import of the words, nor add to nor enlarge their sense. *Bourreseau v. Journal Co.*, 63 Mich. 430.

Error to Wayne. (Reilly, J.) Argued January 15, 1890. Decided January 24, 1890.

Case for libel. Plaintiff brings error. Demurrer of defendants overruled, and the usual time allowed in which to plead to the declaration. The facts are stated in the opinion.

*J. J. Speed* (*H. C. Wisner* and *Edwin F. Conely*, of counsel), for appellant, contended:

1. An article, to be libelous, need not impute a legal crime, or any legal or moral offense or turpitude; citing *Root v. King*, 7 Cow. 613; *King v. Root*, 4 Wend. 113; *Solverson v. Peterson*, 64 Wis. 200, and cases cited; *Parmiter v. Coupland*, 6 Mees. & W. 108 (opinion of Parke, B.); *Curtis v. Mussey*, 6 Gray, 261.

2. If the defamatory matter points to no one in particular, it then becomes a question of fact whether it does or does not apply to the plaintiff; citing *Caruth v. Richeson*, 96 Mo. 186; 2 Add. Torts. (Wood's ed.) 378.

B. Giving defamatory statements as coming from other persons does not deprive them of their defamatory character; citing *Burt v. McBain*, 29 Mich. 260; *Atkinson v. Free Press Co.*, 46 Id. 348.

4. A picture or a caricature may be a libel; citing Odgers, Lib. & Sland. 8, 22; and so may an effigy; citing *Johnson v. Com.*, 14 Atl. Rep. 425.

*Dickinson, Thurber & Stevenson*, for defendants, cited no authorities, and their points are stated in the opinion.

MORSE, J.   The plaintiff commenced a suit in a plea of trespass on the case for libel against the defendants in the Wayne circuit court.

His declaration averred that he was and is a good, true, honest, just, and faithful citizen of this State, and as such had always behaved and conducted himself; that at the time of the printing and publication of the articles of which he complains he was a member of the Legislature of the State of Michigan, from the city of Detroit, being such member from January 2, 1889, up to the present time; that as such member he hath at all times conducted himself as a good, honest, and faithful official, and hath executed and performed his duties as such representative in an honest and conscientious manner, and for the best interests of the State, and of the constituency represented by him, and that he has never been guilty, or, until the time of the publication of these articles by the defendants, been suspected to have been guilty, of the offenses and misconduct hereinafter mentioned to have been charged and imputed to him.

That the said plaintiff, as a member of the said House of Representatives, at the session thereof which began on the first Wednesday of January, 1889, did introduce a bill in said House, entitled—

"A bill to empower the common council of the city of Detroit to borrow money for the purpose of improving the boulevard,"—

And which said bill was duly passed by said House, and on May 7, 1889, passed by the Senate; and said bill is the same bill referred to in the publication by the said defendants as hereinafter mentioned; and that the said defendants, contriving, and wickedly and maliciously intending, to injure the said plaintiff in his good name, fame, and credit, and to bring him into public scandal, disrepute, ridicule, and disgrace with and among his

neighbors, and other good and worthy citizens of this State, and to cause it to be believed by them that he, the said plaintiff, had been guilty of the several acts of misconduct and offense hereinafter mentioned . to have . been imputed to him, heretofore, to wit, on May 8, 1889, at Detroit, in said county of Wayne, falsely, wickedly, and maliciously did compose, print, and publish, and cause and procure to be published, in a certain newspaper, known and styled "The Evening News," and of which numerous copies, to wit, of the number of 40,000, are circulated in said city, county, and State, the words following, to wit, and the picture hereinafter delineated, to wit:

### "A GREAT VICTORY—WHAT NEXT?

"Rep. Randall is receiving congratulations on every hand over his success in inducing the Michigan Legislature to pass a bill designed to enrich a few speculators at the general expense of the city of Detroit. The next move of the speculators will be to corrupt the caucuses of both parties, and bribe and bulldoze a sufficient number of the common council and board of estimates to vote to issue the bonds. This is somewhat of a job, but it will be cheaper than allowing the people to vote on the bonding question direct. If the $500,000 wanted now was all that would be required, the question might arise whether it was worth fighting; but $500,000 is only the entering wedge of a demand that will not stop short of $2,500,000, even if it does then. And all to enrich a few men who have grabbed a street and are determined that other people's money shall make them wealthy. However, the News can stand it a great deal better than the majority of citizens, who must foot the bills. We therefore join the others who are congratulating Mr. Randall on his victory over the solid opposition of his fellow-citizens.

"There probably never was so signal a victory against such great odds in the history of Michigan legislation. Here was a measure proposed avowedly in the personal interests of its introducer and his partners. He made no secret of it. He told his fellow members very plainly from the start that he did not go to Lans-

ing to waste his time in the public service. He went there for this bill, and this bill alone; and he represented himself and his copartners in the deal, who, like himself, had pecuniary interests in the measure. The bill was denounced by the mayor, denounced by the common council, denounced by the board of estimates, denounced by 5,000 petitioners; and Mr. Randall candidly acknowledged before the Senate committee that if it were submitted to the popular vote of Detroit it would be overwhelmed by an adverse majority. Furthermore, the majority of Detroit's Representatives at Lansing opposed it, and still further, the bill was one which concerned Detroit alone, and which in no way affected the State outside of Detroit.

"Here was a situation which might well appall the strongest heart. But it had no terror for the boulevarder's gall. When the Legislature was carefully sized up, it was found to be the smallest, cheapest, rottenest body that ever assembled in Lansing. The premonitory symptoms of a desire to steal something manifested themselves from the beginning. Scarcely a day passed that some measure was not introduced containing promises of boodle, or that the Legislature did not resolve upon some expedition or junket, for which the members voted themselves extra pay or allowance. Nothing was too small for them to despise, nothing too large for them to grasp at. Twenty-five per cent. of the whole gang openly announced themselves by words or acts to be the paid attorneys of outside interests, and most of the remainder of them waited around for these attorneys to share their fees. All who have been to Lansing this winter, and including even the lobbyists, confess that the present Legislature is the rottenest and cheapest that ever gathered at the capitol.

"One thing has conspicuously appeared from a very early date in the session. The Legislature of Michigan has learned the trick, long practiced in the legislature of New York, of looking upon the metropolis of the State as a victim fatted for the sacrifice. In both states the state legislature is overwhelmingly Republican, while the metropolis is overwhelmingly Democratic. At Albany the metropolis is robbed and pillaged by special legislation. Detroit has always been treated with just as little conscience by the Republican Legislature at Lansing, but never until the present winter did it dawn upon the rural legislative mind that she would afford fat pickings for the rural leg-

islative pocket. Mr. Randall materially assisted in impressing the rural legislator with this lesson, by assuring him that the city was governed by Democratic rascals and populated chiefly by Democratic thieves, knaves, rumsellers, and rum drinkers, meanwhile keeping open house, and dealing out free rum himself to the thirsty granger lawmaker. In all these considerations the rustic not only found argument for appropriating Detroit's money to his own use, through the medium of those who expect to recover it, and a hundred times more, from the tax-payers, but also found a salve for his hypocrisy, for he dearly loves to find a moral reason for his thefts. With such a body everything was possible, particularly when $500,000 was at stake.

"But what shall the people of Detroit say to the Republican party, which, through the Legislature it controls, becomes responsible for this infamous treatment of the great city? And what shall the common people of the whole State say, who are in sympathy with the robbed toilers of the city? They and their fellows have been robbed and pillaged by the authority of the Republican party, in the name of the Republican party; their petitions and protests have been spat upon, and their spokesmen branded in the open Senate as anarchists and incendiaries,—all because Detroit gives a Democratic majority. Detroit is, in short, officially informed by the Republican Legislature that so long as she votes the Democratic ticket she will not be allowed to govern herself; she will be ignored in every measure concerning her dearest interests; her Representatives will be snubbed, and only those who go out to Lansing to rob her will be respected or listened to; a junto of State-appointed and irresposible police commissioners will be sustained and supported in oppressing and abusing her law-abiding citizens, while they allow thieves and murderers to escape; and every rascal who makes his way to Lansing with a scheme to thrust his arm into her treasury shall have his way if he brings along money enough to pay for it.

## "THE BOULEVARD PLANS.

"THEY ARE TO GET $100,000 IN BONDS ISSUED THIS YEAR.

"Ald. Lauder outlines them, and says the council and board of estimates will be 'converted' very soon. Can they be 'influenced' as easily as the Legislature?

"The boulevard heelers are in high glee to-day over the slick way that Representative Randall worked his bonding bill through the Legislature. They don't know yet just what the next move will be, but they feel sure that by proper manipulation some of the bonds will be in shape so they can get their hands on them before many moons. Ald. Lauder came out openly this noon, and offered to bet a silk hat that $100,000 worth of the bonds would be issued this year, and he wanted to bet another hat that the present board of aldermen would vote for the bonds by a good majority. He made the offer to a crowd near the Russell House, but, as everybody present knew how easily the boulevarders tied strings to the rural legislators, which enabled them to make the r. l. dance every time the string was pulled, nobody took up the bet.

"'I tell you,' said the alderman, 'the council and the board of estimates, too, are for the boulevard by a good majority. I have not counted noses yet, but I and others have talked to a great many, and know how they stand. They will give us what we want. Hear what I tell you now.'"

"A by-stander, who surmised that the boulevarders might attempt to corrupt the aldermen as they corrupted the rural legislators, asked Ald. Lauder what it was that would make the council go back on their position of two months ago, when they voted three to one against issuing any boulevard bonds.

"'They didn't understand the needs of the boulevard then,' he answered; 'but they are getting better posted on it now. They see that all the money from the bonds will be paid to the workingmen. Oh, I tell you we will get the $100,000 soon.'"

"The alderman is certainly candid, and, as he is in a position to speak for the boulevard, his talk would seem to settle the fact beyond dispute that the boulevarders, instead of waiting till next fall to elect enough aldermen to carry out their schemes, will try to work the present council. Their success in corrupting the rural legislators has encouraged them to try the same influences on the aldermen. But, fortunately for the tax-payers, the people can reach the corrupt aldermen when they come up for election, which they cannot do with the corrupt legislator from Oshkosh or Podunk. The commissioners which the boulevarders named in the park and boulevard con-

solidation bill, and who they expected would lay out an extravagant plan for boulevard improvements, will have a short lease of office. Mayor Pridgeon said to-day that under a decision of the Supreme Court the Legislature has no right to appoint a permanent municipal board of Detroit, the appointment of which is vested in the mayor. The commissioners named in the bill may serve for a short time, but the mayor will appoint a park and boulevard board very soon after he has been officially notified that the law is in force."

The picture cannot well be reproduced here, but it was a caricature of Mr. Randall standing upon a platform, supported at each corner, and resting upon, bottles, one of which was marked "Rye." Upon the platform was a cask marked "Gin," with faucet all ready for opening. Mr. Randall's right foot rested upon this cask. His left hand was pressed against his heart, and his right arm was extended, and clasped in his right hand was a bag marked "$." Above the picture was the following heading:

"THE BOULEVARD NAPOLEON.

" (In the course of his remarks in the Legislature yesterday Mr. Randall stated that within five years the grateful citizens of Detroit would erect a monument in his honor. The News submits the following design.) "

Beneath the picture were three verses of rhyme, which cut no particular figure, as Mr. Randall does not complain of them.

The declaration proceeds:

"Meaning by the said publication to impute to the plaintiff that he had been guilty of gross misconduct in the discharge of his official duties, and had acted as such member of the House of Representatives in a manner which was improper, unjustifiable, and discreditable to him, in this, among other things, in said publication imputed, to wit, that he had, for bad and corrupt motives, induced the Legislature to pass a bill designed to enrich a certain number of persons at the expense of

79 MICH—18.

the city of Detroit; and in this, to wit, that, as a member of said Legislature, he had accepted and received bribes, and was corrupted thereby in his official action in respect to bills pending in or passed by the said House of Representatives; and in this, to wit, that he had, by the giving a bribe, or by other corrupt means, influenced or controlled the giving of votes by members of said Legislature,—by means of the committing of which said grievances, by the said defendants as aforesaid, he, the said plaintiff, hath been and is greatly injured in his said good name, fame, and credit, and brought into public scandal, infamy, and disgrace with and amongst all his neighbors and other good and worthy citizens of this State. And the said plaintiff hath been and is by means of the premises otherwise greatly injured, to wit, at the place aforesaid.

"And for that, whereas, the said plaintiff was always reputed to be a person of good fame and credit, and had deservedly obtained the good opinion, and enjoyed the respect and confidence, of all his neighbors, and all other persons to whom he was known, yet the said defendants, well knowing the premises, and contriving, and wickedly and maliciously intending, to injure the said plaintiff in said good fame and credit, and to bring him into public scandal, ridicule, and disgrace, on, to wit, the 8th of May, 1889, did publish, and cause and procure to be published, of and concerning the said plaintiff a certain false, scandalous, malicious, and defamatory libel in a certain newspaper known as 'The Evening News,' and of a large circulation in said county and State, and of which said libel the following is a copy. [Here follows matter set out above.]

"That plaintiff avers that he is the 'Mr. Randall' mentioned in and referred to by said libel, published as aforesaid, by means whereof he, the said plaintiff, hath been and is greatly injured in said good fame and credit, and brought into public scandal, ridicule, infamy, and disgrace, and he hath suffered much annoyance, and incurred public odium and contempt, and hath otherwise been greatly injured, to wit, at the county and State aforesaid, to the damage of the said plaintiff of one hundred thousand dollars, and therefore he brings suit."

To this declaration the defendants demurred, assigning the following causes:

"1. That the articles, words, and picture set out therein are not libelous or defamatory, and actionable, as charged in said declaration.

"2. That they do not in their ordinary signification and meaning impute to the plaintiff any legal crime, or any legal or moral offense, or legal or moral turpitude, and no such signification is charged in the second count.

"3. Because there are no matters of inducement or extrinsic facts set up in said declaration to warrant an extension of the meaning of the alleged libelous words and pictures beyond what they naturally imply.

"4. Because the alleged matter of inducement or extrinsic facts set up in said declaration are not supported by any warranted innuendo sufficient with such inducement to give plaintiff a right of action.

"5. Because the alleged libelous words and picture complained of are incapable of the meaning attached to them by the averments contained in said declaration.

"6. Because it does not appear by said declaration that the picture set up in said declaration was published or connected with any of the published words or articles appearing complete within themselves, whereby the alleged reflection upon the character of members of the Legislature generally is applied to or directed at the plaintiff.

"7. Because in the second count of said declaration no time of the publication is alleged, and because there is no innuendo sufficient with the inducement to give the said plaintiff a right of action under said count.

"8. Because the declaration is in other respects uncertain, informal, and insufficient."

This demurrer was sustained by the court below.

The plaintiff claims, as it will be seen from his declaration, that these articles and the picture impute to him, among other things, these three things:

1. That he had, for bad and corrupt motives, induced the Legislature to pass a bill designed to enrich a certain number of persons at the expense of the city of Detroit.

2. That he, as a member of such Legislature, had accepted and received bribes, and was corrupted thereby in his official action in respect to the bills pending in or passed by the said House of Representatives.

3. That he had, by the giving of a bribe, or by other

corrupt means, influenced or controlled the giving of votes by members of said Legislature.

The second imputation does not follow from the articles, or any language contained within them, or from the picture, and was so admitted upon the argument in this Court by plaintiff's counsel.

But we think that the first and last imputations are found within the articles. The plain meaning of the articles is—

1. That Mr. Randall did not go to Lansing as a member of the Legislature to serve the public, and so publicly expressed himself, but that he went there alone for the purpose of passing this boulevard bill, to enrich himself and his copartners in the boulevard scheme at the expense of the people of the city of Detroit.

2. That the Legislature was of such a character that they were grasping for boodle (meaning money), and that the members were susceptible of bribery, in the shape of liquor and money, from those interested in the passage of bills, and that Mr. Randall, taking advantage of this characteristic of said members, used both liquor and money to accomplish the passage of this bill, which was to put money in his own pocket at the tax-payers' expense.

The picture itself is capable of but one meaning, and that is that Randall's monument should show that liquor and money was the source of his Napoleon-like success in passing the bill. This is libelous, if not true.

It is gravely argued that men are elected to the Legislature and to the Congress of the United States at every election, avowedly in the interest of private schemes of plunder, and not in the interest of the public, to represent corporations and other bodies or associations of men for their financial advancement and profit, without reference to the interests of the people at large, or even the constituency of the member so elected; that there is nothing illegal in this, because there is no law or statute providing that a member shall lose his seat by so doing;

that · it is at least perfectly legal for a member of the Legislature to devote his whole time and energies as such member to enrich himself, or the class or corporation he represents, at the expense of the public.

If there is no law against such action by a member of the Legislature, it is high time that statutes be enacted looking towards not only the unseating of a member guilty of prostituting his high place to personal and corrupt greed, but providing, also, a punishment for such misconduct. Be that as it may, however, we are satisfied that public sentiment is not yet such as to look with either favor or complacency upon a member of the Legislature whose whole avowed aim and effort is to enrich himself, or those who hire him, at the expense of the tax-payers. And we are satisfied that, if the charge made against Mr. Randall in this respect be true, he deserves the scorn and contempt of every good citizen, and would receive it. Consequently, if untrue, it is libelous, and has damaged him in the estimation of good men and honest citizens, and whom we believe to be yet largely in the majority in every community in our State.

It is equally libelous, if untrue, to state that Mr. Randall accomplished the passage of this boulevard bill by keeping open house, with liquors (which is the true and plain meaning of these publications), or that he did it by the use of boodle.

The inducement in the declaration was sufficient. It is the office of the inducement to narrate the extrinsic circumstances, which, coupled with the language published, affect its construction and render it actionable, where, standing alone, and not thus explained, the language would appear either not to concern the plaintiff, or, if concerning him, not to affect him injuriously. It is a statement of the facts out of which the charge arises, or which are necessary or useful to make the charge intel-

ligible. Here the inducement shows Mr. Randall to have been a member of the Michigan House of Representatives from the city of Detroit, and the introducer of the boulevard bill, or a bill authorizing the common council of the city of Detroit to raise money to improve the boulevard. With this showing the articles are intelligible, and their actionable character apparent.

Nor was there any necessity of any innuendoes. As said in *Bourreseau v. Journal Co.*, 63 Mich. 430—

"If the meaning of the publication is plain, therefore, no innuendo is needed. The use of it can never change the import of the words, nor add to nor enlarge their sense."

The court erred in sustaining the demurrer. The judgment of the court below is therefore reversed, and the demurrer of the defendants overruled. The record will be remanded, and the usual time will be allowed the defendants in which to plead to the declaration if they so desire. Costs of this Court, and of the demurrer in the court below, will be granted plaintiff.

The other Justices concurred.