STATE OF CONNECTICUT *v.* ANONYMOUS (1976–8)*

APPELLATE DIVISION OF THE CIRCUIT COURT

JACOBS, J. The defendant was convicted in the Circuit Court upon information of violating

---

* Thus entitled, in view of General Statutes § 54-90.

§ 53-174[1] of the General Statutes. The finding, which has not been attacked, discloses these facts: The defendant was the editor of a student newspaper published on a weekly basis at a local university. Prior to a presidential election, the newspaper contained considerable material concerning the forthcoming election. A particular issue of the publication "contained a drawing depicting a semi-clenched fist with the middle finger in an up-raised position and the tip of said up-raised finger portraying the end of a penis." Underneath that drawing was the name of a presidential candidate. The newspaper was distributed and circulated within the city in which the university was located. The court concluded that the drawing was offensive, abusive, and indecent; that it was directed at the named presidential candidate; that the state was not required to allege that the defendant acted with malice; and that malice was implied from the fact that the drawing was published.

The information was in the short form and complied with the requirements of Practice Book § 493 (a). See *State* v. *Davis,* 141 Conn. 319, 320. "This section provides that an offense may be charged by using the name given to it by the common law or by a statute, or by stating so much of the definition of the offense as is sufficient to give the court and the accused notice of what offense is intended to be charged." *State* v. *Whiteside,* 148 Conn. 208, 210,

---

[1] "Sec. 53-174. BREACH OF THE PEACE. INTIMIDATION. LIBEL. Any person who disturbs or breaks the peace . . . or writes or prints and publicly exhibits or distributes . . . any offensive, indecent or abusive matter concerning any person, shall be fined . . . or imprisoned . . . or both." This is a pre-code crime, having allegedly occurred prior to the adoption of the Penal Code (Title 53a), effective October 1, 1971. Section 53-174 has since been repealed. 1969 Public Acts, No. 828 § 214. However, the breach of the peace statute in the new Penal Code § 53a-181 makes it a crime for a person who "(4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person . . . ."

cert. denied, 368 U.S. 830. Had there been any question in the mind of the defendant as to what offense he was being called on to defend against, he could have filed a motion for a bill of particulars. Practice Book § 495. This he did not do.

The defendant assigned as error the trial court's rulings that malice may be implied from the act of publication, that the state was not required to allege that the defendant acted with malice, and that the drawing in question was offensive, abusive, and indecent. Further, the defendant challenged the statute, both on its face and as applied to him, as violating the liberty of speech and of the press guaranteed as against the states by the first amendment and the due process clause of the fourteenth amendment. With the view we take of this case, it becomes necessary to examine only the defendant's contention that the trial court erred in ruling that malice may be implied from the act of publication. Hence we decline to reach the very significant constitutional questions raised.

## I

Hardly any branch of the English law has had a longer or more interesting history than the law of criminal libel the development of which has reflected the changes in public attitude toward the value and necessity of free speech. See 2 Stephen, "A History of the Criminal Law of England" (1883 Ed.), p. 299. The theory of criminal libel ever since *De Libellis Famosis,* 5 Coke Rep. 125 (a), 77 Eng. Rep. 250 (1609), has been that the government has the right to punish certain utterances because they inevitably lead to breaches of the peace. "Any publication which has a tendency to disturb the public peace or good order of society is a libel by the common law, and is indictable as such." Newell, "The Law of Slander and Libel" (3d Ed.), pp. 3, 15–17. It is clear

that the tendency of the utterance to create breach of the peace is at least nominally the basis of the crime. The crime is not defined in terms of its tendency to create violence and its possible effect on the public; rather, it is formulated in terms of the substantial character of the utterance, the assumption being that, given certain speech, violence may be conclusively presumed to result. With the passage of time, however, there has been an effort to expand and alter somewhat the original, narrow meaning of criminal libel. The emphasis is no longer on the effect of the libel on the public peace, but on the tendency of the publication to damage the individual. Thus, focus has shifted from the tendency of the utterance to create disorder to its tendency to harm individual reputation.[2]

## II

The libel of which the defendant stands convicted in the present case falls within a rather unusual category. Unlike virtually all other cases of libel, the defendant's cartoon does not consist of a statement, inference, or opinion of facts. And unlike the few reported cases involving libel by means of political cartoons (see *Newby* v. *Times-Mirror Co.,* 173 Cal. 387; *Randall* v. *Evening News Assn.,* 79 Mich. 266), the drawing in this case bore no caption or other graphic display from which any inference of fact might possibly be drawn.

Judge Learned Hand recognized this rare type of libel in *Burton* v. *Crowell Publishing Co.,* 82 F.2d 154 (2d Cir.). There the publication of a picture which held the plaintiff up to ridicule was ruled actionable notwithstanding the fact that the picture did not assume to state a fact or an opinion.

[2] "The legislation [criminal libel] is rather clearly directed at injury to *individual* repute ('*one* who is dead . . . *one* who is alive . . . expose *him* to public hatred, etc.')." Model Penal Code (Tent. Draft No. 13, 1961) § 250.7, Comments, p. 43.

In coming to that conclusion, Judge Hand observed that defamation was not a favored cause of action at common law and that any "excuse" pleaded by the defendant might defeat recovery. Significantly, he considered truth to be only one of the available "excuses." In that case, he stated (p. 156): "In all wrongs we must first ascertain whether the interest invaded is one which the law will protect at all; that is indeed especially important in defamation, for the common law did not recognize all injuries to reputation . . . . But the interest here is by hypothesis one which the law does protect; the plaintiff has been substantially enough ridiculed to be in a position to complain. The defendant must therefore find some excuse, and truth would be an excuse if it could be pleaded. The only reason why the law makes truth a defense is not because a libel must be false, but because the utterance of truth is in all circumstances an interest paramount to reputation; it is like a privileged communication, which is privileged only because the law prefers it conditionally to reputation. When there is no such countervailing interest, there is no excuse."

## III

That there is a countervailing interest and, hence, an excuse in this case is clear from the opinion of the United States Supreme Court in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, wherein it was observed (p. 270): "[W]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

In holding that an Alabama police commissioner could not recover damages from the New York

Times for a partially false and allegedly defamatory editorial advertisement appearing in the newspaper, the court formulated what has come to be called the *New York Times* rule: "The constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* supra, 279–80. The Supreme Court of Connecticut relied on that rule in holding that actual malice must be present for a policeman to prevail in a libel action against a newspaper and a citizen whose allegedly defamatory letter was published by the newspaper. See *Moriarty* v. *Lippe,* 162 Conn. 371.

The *New York Times* rule was soon extended by the Supreme Court from civil to criminal libel situations: "We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in *New York Times* . . . apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy." *Garrison* v. *Louisiana,* 379 U.S. 64, 74.

The Connecticut Supreme Court, in a pre-*New York Times* decision, adopted the position that actual malice must be proven by the state in a criminal libel action if the allegedly libelous publication was made under legally privileged circumstances. After stating that malice may be implied from the mere fact of publication in any situation

not involving legal privilege, the court continued in *State* v. *Whiteside,* 148 Conn. 208, 211: "The situation changes, however, when it is shown that the publication was made in circumstances which the law recognizes as an occasion of privilege. . . . Such an occasion rebuts the implication of malice which the law draws from the publication of false and defamatory matter, and casts upon the state the burden of proving that the occasion had been abused and that the defendant was in fact actuated by malice toward the libelee."

Since the publication of the drawing here directed at a presidential candidate involved comment on a public official within the meaning of *New York Times* and *Garrison,* we hold that the defendant was cloaked with the limited privilege recognized by those decisions. Applying the standard enunciated in those cases, and earlier detailed by our Supreme Court in *State* v. *Whiteside,* supra, we further hold that the state has the burden of proving that the defendant was in fact actuated by malice toward the target of his publication. It was error for the trial court to rule that malice could be implied from the fact of publication.

### IV

In deciding this case as we do today, we are not unmindful of the unpopular and distasteful actions which have been, and will continue to be, immunized by the constitutional guarantees of freedom of speech and the press. Along with Mr. Justice Harlan, however, we measure the survival and success of liberty, in part, by the diversity of opinions and modes of expression entertained by our citizens and fostered by our constitution: "To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side

effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. That is why '[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons,' *Winters* v. *New York,* 333 U.S. 507, 528 (1948) (Frankfurter, J., dissenting), and why 'so long as the means are peaceful, the communication need not meet standards of acceptability,' *Organization for a Better Austin* v. *Keefe,* 402 U.S. 415, 419 (1971)." *Cohen* v. *California,* 403 U.S. 15, 24–25.

It was incumbent upon the state to prove actual malice in order to sustain a conviction for criminal libel; we are forbidden by the *New York Times* rule to hold that malice may be implied from the mere fact that the drawing was published, however crude and vulgar the characterization may be.

There is error, the judgment is set aside and a new trial ordered.

In this opinion KINMONTH and LACEY, Js., concurred.