## WINTERS *v.* NEW YORK.

No. 3.   Argued March 27, 1946.—Reargued November 19, 1946.—
Reargued November 10, 1947.—Decided March 29, 1948.

*Arthur N. Seiff* argued the cause and filed the briefs for appellant.   With him on the original argument and the first reargument was *Emanuel Redfield.*

*Whitman Knapp* argued the cause for appellee.   With him on the briefs was *Frank S. Hogan.*

Briefs of *amici curiae* urging reversal were filed by *Sidney R. Fleisher* for the Authors' League of America, Inc.; and *Emanuel Redfield, Osmond K. Fraenkel* and *Morris L. Ernst* for the American Civil Liberties Union.

Mr. Justice Reed delivered the opinion of the Court.

Appellant is a New York City bookdealer, convicted, on information,[1] of a misdemeanor for having in his possession with intent to sell certain magazines charged to violate subsection 2 of § 1141 of the New York Penal Law. It reads as follows:

"§ 1141. Obscene prints and articles

1. A person . . . who,

2. Prints, utters, publishes, sells, lends, gives away, distributes or shows, or has in his possession with intent to sell, lend, give away, distribute or show, or otherwise offers for sale, loan, gift or distribution, any book, pamphlet, magazine, newspaper or other printed paper devoted to the publication, and principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime; . . .

. . . . .

Is guilty of a misdemeanor, . . ."

---

[1] The counts of the information upon which appellant was convicted charged, as the state court opinions show, violation of subsection 2 of § 1141. An example follows:

"Fourth Count

"And I, the District Attorney aforesaid, by this information, further accuse the said defendant of the Crime of Unlawfully Possessing Obscene Prints, committed as follows:

"The said defendant, on the day and in the year aforesaid, at the city and in the county aforesaid, with intent to sell, lend, give away and show, unlawfully did offer for sale and distribution, and have in his possession with intent to sell, lend, give away and show, a certain obscene, lewd, lascivious, filthy, indecent and disgusting magazine entitled 'Headquarters Detective, True Cases from the Police Blotter, June 1940', the same being devoted to the publication and principally made up of criminal news, police reports, and accounts of criminal deeds, and pictures and stories of deeds of bloodshed, lust and crime."

Upon appeal from the Court of Special Sessions, the trial court, the conviction was upheld by the Appellate Division of the New York Supreme Court, 268 App. Div. 30, 48 N. Y. S. 2d 230, whose judgment was later upheld by the New York Court of Appeals. 294 N. Y. 545, 63 N. E. 2d 98.

The validity of the statute was drawn in question in the state courts as repugnant to the Fourteenth Amendment to the Constitution of the United States in that it denied the accused the right of freedom of speech and press, protected against state interference by the Fourteenth Amendment. *Gitlow* v. *New York,* 268 U. S. 652, 666; *Pennekamp* v. *Florida,* 328 U. S. 331, 335. The principle of a free press covers distribution as well as publication. *Lovell* v. *City of Griffin,* 303 U. S. 444, 452. As the validity of the section was upheld in a final judgment by the highest court of the state against this constitutional challenge, this Court has jurisdiction under Judicial Code § 237 (a). This appeal was argued at the October 1945 Term of this Court and set down for reargument before a full bench at the October 1946 Term. It was then reargued and again set down for further reargument at the present term.

The appellant contends that the subsection violates the right of free speech and press because it is vague and indefinite. It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment. *Stromberg* v. *California,* 283 U. S. 359, 369; *Herndon* v. *Lowry,* 301 U. S. 242, 258. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions,

protected by the principles of the First Amendment, violates an accused's rights under procedural due process and freedom of speech or press. Where the alleged vagueness of a state statute had been cured by an opinion of the state court, confining a statute punishing the circulation of publications "having a tendency to encourage or incite the commission of any crime" to "encouraging an actual breach of law," this Court affirmed a conviction under the stated limitation of meaning. The accused publication was read as advocating the commission of the crime of indecent exposure. *Fox* v. *Washington,* 236 U. S. 273, 277.

We recognize the importance of the exercise of a state's police power to minimize all incentives to crime, particularly in the field of sanguinary or salacious publications with their stimulation of juvenile delinquency. Although we are dealing with an aspect of a free press in its relation to public morals, the principles of unrestricted distribution of publications admonish us of the particular importance of a maintenance of standards of certainty in the field of criminal prosecution for violation of statutory prohibitions against distribution. We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature. Cf. *Hannegan* v. *Esquire,* 327 U. S. 146, 153, 158. They are equally subject to control if they are lewd, indecent, obscene or profane. *Ex parte Jackson,* 96 U. S. 727, 736; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.

The section of the Penal Law, § 1141 (2), under which the information was filed is a part of the "indecency" article of that law. It comes under the caption "Obscene prints and articles." Other sections make punishable various acts of indecency. For example, § 1141 (1), a section not here in issue but under the same caption, punishes the distribution of obscene, lewd, lascivious, filthy, indecent or disgusting magazines.[2] Section 1141 (2) originally was aimed at the protection of minors from the distribution of publications devoted principally to criminal news and stories of bloodshed, lust or crime.[3] It was later broadened to include all the population and other phases of production and possession.

Although many other states have similar statutes, they, like the early statutes restricting paupers from changing residence, have lain dormant for decades. *Edwards* v. *California,* 314 U. S. 160, 176. Only two other state courts, whose reports are printed, appear to have construed language in their laws similar to that here involved. In *Strohm* v. *Illinois,* 160 Ill. 582, 43 N. E. 622, a statute to suppress exhibiting to any minor child publications of this character was considered. The conviction was upheld. The case, however, apparently did not involve any problem of free speech or press or denial of due

---

[2] "§ 1141. . . . 1. A person who sells, lends, gives away, distributes or shows, or offers to sell, lend, give away, distribute, or show, or has in his possession with intent to sell, lend, distribute or give away, or to show, or advertises in any manner, or who otherwise offers for loan, gift, sale or distribution, any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet, newspaper, story paper, writing, paper, picture, drawing, photograph, figure or image, or any written or printed matter of an indecent character; . . .

.        .        .        .        .

"Is guilty of a misdemeanor, . . . ."

[3] Ch. 380, New York Laws, 1884; ch. 692, New York Laws, 1887; ch. 925, New York Laws, 1941.

process for uncertainty under the Fourteenth Amendment.

In *State* v. *McKee,* 73 Conn. 18, 46 A. 409, the court considered a conviction under a statute which made criminal the sale of magazines "devoted to the publication, or principally made up of criminal news, police reports, or pictures and stories of deeds of bloodshed, lust, or crime." The gist of the offense was thought to be a "selection of immoralities so treated as to excite attention and interest sufficient to command circulation for a paper devoted mainly to the collection of such matters." Page 27. It was said, apropos of the state's constitutional provision as to free speech, that the act did not violate any constitutional provision relating to the freedom of the press. It was held, p. 31, that the principal evil at which the statute was directed was "the circulation of this massed immorality." As the charge stated that the offense might be committed "whenever the objectionable matter is a leading feature of the paper or when special attention is devoted to the publication of the prohibited items," the court felt that it failed to state the full meaning of the statute and reversed. As in the *Strohm* case, denial of due process for uncertainty was not raised.

On its face, the subsection here involved violates the rule of the *Stromberg* and *Herndon* cases, *supra,* that statutes which include prohibitions of acts fairly within the protection of a free press are void. It covers detective stories, treatises on crime, reports of battle carnage, *et cetera.* In recognition of this obvious defect, the New York Court of Appeals limited the scope by construction. Its only interpretation of the meaning of the pertinent subsection is that given in this case. After pointing out that New York statutes against indecent or obscene publications have generally been construed to refer to sexual impurity, it interpreted the section here in question to forbid these publications as "indecent or obscene" in a

different manner. The Court held that collections of criminal deeds of bloodshed or lust "can be so massed as to become vehicles for inciting violent and depraved crimes against the person and in that case such publications are indecent or obscene in an admissible sense, . . ." 294 N. Y. at 550. "This idea," its opinion goes on to say, "was the principal reason for the enactment of the statute." The Court left open the question of whether "the statute extends to accounts of criminal deeds not characterized by bloodshed or lust" because the magazines in question "are nothing but stories and pictures of criminal deeds of bloodshed and lust." As the statute in terms extended to other crimes, it may be supposed that the reservation was on account of doubts as to the validity of so wide a prohibition. The court declared: "In short, we have here before us accumulations of details of heinous wrongdoing which plainly carried an appeal to that portion of the public who (as many recent records remind us) are disposed to take to vice for its own sake." Further, the Court of Appeals, 294 N. Y. at 549, limited the statute so as not to "outlaw all commentaries on crime from detective tales to scientific treatises" on the ground that the legislature did not intend such literalness of construction. It thought that the magazines the possession of which caused the filing of the information were indecent in the sense just explained. The Court had no occasion to and did not weigh the character of the magazine exhibits by the more frequently used scales of § 1141 (1), printed in note 2. It did not interpret § 1141 (2) to punish distribution of indecent or obscene publications, in the usual sense, but that the present magazines were indecent and obscene because they "massed" stories of bloodshed and lust to incite crimes. Thus interpreting § 1141 (2) to include the expanded concept of indecency and obscenity stated in its opinion, the Court of Appeals met appellant's contention

of invalidity from indefiniteness and uncertainty of the subsection by saying, 294 N. Y. at 551,

> "In the nature of things there can be no more precise test of written indecency or obscenity than the continuing and changeable experience of the community as to what types of books are likely to bring about the corruption of public morals or other analogous injury to the public order.  Consequently, a question as to whether a particular publication is indecent or obscene in that sense is a question of the times which must be determined as matter of fact, unless the appearances are thought to be necessarily harmless from the standpoint of public order or morality."

The opinion went on to explain that publication of any crime magazine would be no more hazardous under this interpretation than any question of degree and concluded, p. 552,

> "So when reasonable men may fairly classify a publication as necessarily or naturally indecent or obscene, a mistaken view by the publisher as to its character or tendency is immaterial."

The Court of Appeals by this authoritative interpretation made the subsection applicable to publications that, besides meeting the other particulars of the statute, so massed their collection of pictures and stories of bloodshed and of lust "as to become vehicles for inciting violent and depraved crimes against the person."  Thus, the statute forbids the massing of stories of bloodshed and lust in such a way as to incite to crime against the person.  This construction fixes the meaning of the statute for this case. The interpretation by the Court of Appeals puts these words in the statute as definitely as if it had been so amended by the legislature. *Hebert* v. *Louisiana,* 272 U. S. 312, 317; *Skiriotes* v. *Florida,* 313 U. S. 69, 79. We assume that the defendant, at the time he acted, was chargeable with knowledge of the scope of subsequent

interpretation. Compare *Lanzetta* v. *New Jersey,* 306 U. S. 451. As lewdness in publications is punishable under § 1141 (1) and the usual run of stories of bloodshed, such as detective stories, are excluded, it is the massing as an incitation to crime that becomes the important element.

Acts of gross and open indecency or obscenity, injurious to public morals, are indictable at common law, as violative of the public policy that requires from the offender retribution for acts that flaunt accepted standards of conduct. 1 Bishop, Criminal Law (9th ed.), § 500; Wharton, Criminal Law (12th ed.), § 16. When a legislative body concludes that the mores of the community call for an extension of the impermissible limits, an enactment aimed at the evil is plainly within its power, if it does not transgress the boundaries fixed by the Constitution for freedom of expression. The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. The crime "must be defined with appropriate definiteness." *Cantwell* v. *Connecticut,* 310 U. S. 296; *Pierce* v. *United States,* 314 U. S. 306, 311. There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment.[4] The vagueness may be from uncertainty in regard to persons within the scope of the act, *Lanzetta* v.

[4] *Connally* v. *General Construction Co.,* 269 U. S. 385, 391–92: "But it will be enough for present purposes to say generally that the decisions of the court upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, . . . or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, . . . or, as broadly stated by Mr. Chief Justice White in *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 92, 'that, for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded.' "

*New Jersey,* 306 U. S. 451, or in regard to the applicable tests to ascertain guilt.[5]

Other states than New York have been confronted with similar problems involving statutory vagueness in connection with free speech. In *State* v. *Diamond,* 27 New Mexico 477, 202 P. 988, a statute punishing "any act of any kind whatsoever which has for its purpose or aim the destruction of organized government, federal, state or municipal, or to do or cause to be done any act which is antagonistic to or in opposition to such organized government, or incite or attempt to incite revolution or opposition to such organized government" was construed. The court said, p. 479: "Under its terms no distinction is made between the man who advocates a change in the form of our government by constitutional means, or advocates the abandonment of organized government by peaceful methods, and the man who advocates the overthrow of our government by armed revolution, or other form of force and violence." Later in the opinion the statute was held void for uncertainty, p. 485:

> "Where the statute uses words of no determinative meaning, or the language is so general and indefinite as to embrace not only acts commonly recognized as reprehensible, but also others which it is unreasonable to presume were intended to be made criminal, it will be declared void for uncertainty."

Again in *State* v. *Klapprott,* 127 N. J. L. 395, 22 A. 2d 877, a statute was held invalid on an attack against its constitutionality under state and federal constitutional provisions that protect an individual's freedom of expression. The statute read as follows, p. 396:

> "Any person who shall, in the presence of two or more persons, in any language, make or utter any

---

[5] *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 89–93; *Champlin Refining Co.* v. *Corporation Commission,* 286 U. S. 210, 242; *Smith* v. *Cahoon,* 283 U. S. 553, 564.

speech, statement or declaration, which in any way incites, counsels, promotes, or advocates hatred, abuse, violence or hostility against any group or groups of persons residing or being in this state by reason of race, color, religion or manner of worship, shall be guilty of a misdeameanor."

The court said, pp. 401–2:

"It is our view that the statute, *supra,* by punitive sanction, tends to restrict what one may say lest by one's utterances there be incited or advocated hatred, hostility or violence against a group 'by reason of race, color, religion or manner of worship.' But additionally and looking now to strict statutory construction, is the statute definite, clear and precise so as to be free from the constitutional infirmity of the vague and indefinite? That the terms 'hatred,' 'abuse,' 'hostility,' are abstract and indefinite admits of no contradiction. When do they arise? Is it to be left to a jury to conclude beyond reasonable doubt when the emotion of hatred or hostility is aroused in the mind of the listener as a result of what a speaker has said? Nothing in our criminal law can be invoked to justify so wide a discretion. The criminal code must be definite and informative so that there may be no doubt in the mind of the citizenry that the interdicted act or conduct is illicit."

This Court goes far to uphold state statutes that deal with offenses, difficult to define, when they are not entwined with limitations on free expression.[6] We have the same attitude toward federal statutes.[7] Only a definite conviction by a majority of this Court that the conviction violates the Fourteenth Amendment justifies

---

[6] *Omaechevarria* v. *Idaho,* 246 U. S. 343; *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86.

[7] *United States* v. *Petrillo,* 332 U. S. 1; *Gorin* v. *United States,* 312 U. S. 19.

reversal of the court primarily charged with responsibility to protect persons from conviction under a vague state statute.

The impossibility of defining the precise line between permissible uncertainty in statutes caused by describing crimes by words well understood through long use in the criminal law—obscene, lewd, lascivious, filthy, indecent or disgusting—and the unconstitutional vagueness that leaves a person uncertain as to the kind of prohibited conduct—massing stories to incite crime—has resulted in three arguments of this case in this Court. The legislative bodies in draftsmanship obviously have the same difficulty as do the judicial in interpretation. Nevertheless despite the difficulties, courts must do their best to determine whether or not the vagueness is of such a character "that men of common intelligence must necessarily guess at its meaning." *Connally* v. *General Constr. Co.,* 269 U. S. 385, 391. The entire text of the statute or the subjects dealt with may furnish an adequate standard.[8] The present case as to a vague statute abridging free speech involves the circulation of only vulgar magazines. The next may call for decision as to free expression of political views in the light of a statute intended to punish subversive activities.

The subsection of the New York Penal Law, as now interpreted by the Court of Appeals, prohibits distribution of a magazine principally made up of criminal news or stories of deeds of bloodshed or lust, so massed as to become vehicles for inciting violent and depraved crimes against the person. But even considering the gloss put upon the literal meaning by the Court of Appeals' restriction of the statute to collections of stories "so massed as to become vehicles for inciting violent and depraved

---

[8] *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 501; *Mutual Film Corp.* v. *Ohio Industrial Commission,* 236 U. S. 230, 245–46; *Screws* v. *United States,* 325 U. S. 91, 94–100.

crimes against the person . . . not necessarily . . . sexual passion," we find the specification of publications, prohibited from distribution, too uncertain and indefinite to justify the conviction of this petitioner. Even though all detective tales and treatises on criminology are not forbidden, and though publications made up of criminal deeds not characterized by bloodshed or lust are omitted from the interpretation of the Court of Appeals, we think fair use of collections of pictures and stories would be interdicted because of the utter impossibility of the actor or the trier to know where this new standard of guilt would draw the line between the allowable and the forbidden publications. No intent or purpose is required— no indecency or obscenity in any sense heretofore known to the law. "So massed as to incite to crime" can become meaningful only by concrete instances. This one example is not enough. The clause proposes to punish the printing and circulation of publications that courts or juries may think influence generally persons to commit crimes of violence against the person. No conspiracy to commit a crime is required. See *Musser* v. *Utah,* 333 U. S. 95. It is not an effective notice of new crime. The clause has no technical or common law meaning. Nor can light as to the meaning be gained from the section as a whole or the Article of the Penal Law under which it appears. As said in the *Cohen Grocery Company* case, *supra,* p. 89:

> "It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against."

The statute as construed by the Court of Appeals does not limit punishment to the indecent and obscene, as formerly understood. When stories of deeds of bloodshed, such as many in the accused magazines, are massed so as to incite to violent crimes, the statute is violated. It does

not seem to us that an honest distributor of publications could know when he might be held to have ignored such a prohibition.   Collections of tales of war horrors, otherwise unexceptionable, might well be found to be "massed" so as to become "vehicles for inciting violent and depraved crimes."   Where a statute is so vague as to make criminal an innocent act, a conviction under it cannot be sustained. *Herndon* v. *Lowry,* 301 U. S. 242, 259.

To say that a state may not punish by such a vague statute carries no implication that it may not punish circulation of objectionable printed matter, assuming that it is not protected by the principles of the First Amendment, by the use of apt words to describe the prohibited publications.   Section 1141, subsection 1, quoted in note 2, is an example.   Neither the states nor Congress are prevented by the requirement of specificity from carrying out their duty of eliminating evils to which, in their judgment, such publications give rise.

*Reversed.*

MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE JACKSON and MR. JUSTICE BURTON, dissenting.

By today's decision the Court strikes down an enactment that has been part of the laws of New York for more than sixty years,[1] and New York is but one of twenty States having such legislation.   Four more States

---

[1] The original statute, N. Y. L. 1884, c. 380, has twice since been amended in minor details.   N. Y. L. 1887, c. 692; N. Y. L. 1941, c. 925.   In its present form, it reads as follows:

"§ 1141.   Obscene prints and articles

"1. A person . . . who,

.        .        .        .        .

"2. Prints, utters, publishes, sells, lends, gives away, distributes or shows, or has in his possession with intent to sell, lend, give away, distribute or show, or otherwise offers for sale, loan, gift or distribu-

have statutes of like tenor which are brought into question by this decision, but variations of nicety preclude one from saying that these four enactments necessarily fall within the condemnation of this decision. Most of this legislation is also more than sixty years old. The latest of the statutes which cannot be differentiated from New York's law, that of the State of Washington, dates from 1909. It deserves also to be noted that the legislation was judicially applied and sustained nearly fifty years ago. See *State* v. *McKee,* 73 Conn. 18, 46 A. 409. Nor is this an instance where the pressure of proximity or propaganda led to the enactment of the same measure in a concentrated region of States. The impressiveness of the number of States which have this law on their statute

---

tion, any book, pamphlet, magazine, newspaper or other printed paper devoted to the publication, and principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime; . . .

.        .        .        .        .

"Is guilty of a misdemeanor . . . ."

That this legislation was neither a casual enactment nor a passing whim is shown by the whole course of its history. The original statute was passed as the result of a campaign by the New York Society for the Suppression of Vice and the New York Society for the Prevention of Cruelty to Children. See 8th Ann. Rep., N. Y. Soc. for the Suppression of Vice (1882) p. 7; 9th *id.* (1883) p. 9; 10th *id.* (1884) p. 8; 11th *id.* (1885) pp. 7–8. The former organization, at least, had sought legislation covering many more types of literature and conduct. See 8th *id.* (1882) pp. 6–9; 9th *id.* (1883) pp. 9–12. On the other hand, in 1887, the limitation of the statute to sales, etc., to children was removed. N. Y. L. 1887, c. 692. More recently, it has been found desirable to add to the remedies available to the State to combat this type of literature. A 1941 statute conferred jurisdiction upon the Supreme Court, at the instance of the chief executive of the community, to enjoin the sale or distribution of such literature. N. Y. L. 1941, c. 925, § 2, N. Y. Code Crim. Proc. § 22–a. (The additional constitutional problems that might be raised by such injunctions, cf. *Near* v. *Minnesota,* 283 U. S. 697, are of course not before us.)

books is reinforced by their distribution throughout the country and the time range of the adoption of the measure.[2] Cf. Hughes, C. J., in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 399.

These are the statutes that fall by this decision:[3]

1. Gen. Stat. Conn. (1930) c. 329, § 6245, derived from L. 1885, c. 47, § 2.*

2. Ill. Ann. Stat. (Smith-Hurd) c. 38, § 106, derived from Act of June 3, 1889, p. 114, § 1 (minors).

3. Iowa Code (1946) § 725.8, derived from 21 Acts, Gen. Assembly, c. 177, § 4 (1886) (minors).

4. Gen. Stats. Kans. (1935) § 21–1102, derived from L. 1886, c. 101, § 1.

5. Ky. Rev. Stat. (1946) § 436.110, derived from L. 1891–93, c. 182, § 217 (1893) (similar).

6. Rev. Stat. Maine (1944) c. 121, § 27, derived from Acts and Resolves 1885, c. 348, § 1 (minors).

7. Ann. Code Md. (1939) Art. 27, § 496, derived from L. 1894, c. 271, § 2.

8. Ann. Laws Mass. (1933) c. 272, § 30, derived from Acts and Resolves 1885, c. 305 (minors).

9. Mich. Stat. Ann. (1938) § 28.576, derived from L. 1885, No. 138.

10. Minn. Stat. (1945) § 617.72, derived from L. 1885, c. 268, § 1 (minors).

11. Mo. Rev. Stat. (1939) § 4656, derived from Act of April 2, 1885, p. 146, § 1 (minors).

---

[2] We have no statistics or other reliable knowledge as to the incidence of violations of these laws, nor as to the extent of their enforcement. Suffice it to say that the highest courts of three of the most industrialized States—Connecticut, Illinois, and New York—have had this legislation before them.

[3] This assumes a similar construction for essentially the same laws.

*Since this opinion was filed, Conn. L. 1935, c. 216, repealing this provision, has been called to my attention.

12. Rev. Code Mont. (1935) § 11134, derived from Act of March 4, 1891, p. 255, § 1 (minors).

13. Rev. Stat. Neb. (1943) § 28–924, derived from L. 1887, c. 113, § 4 (minors).

14. N. Y. Consol. L. (1938) Penal Law, Art. 106, § 1141 (2), derived from L. 1884, c. 380.

15. N. D. Rev. Code (1943) § 12–2109, derived from L. 1895, c. 84, § 1 (similar).

16. Ohio Code Ann. (Throckmorton, 1940) § 13035, derived from 82 Sess. L. 184 (1885) (similar).

17. Ore. Comp. L. Ann. (1940) § 23–924, derived from Act of Feb. 25, 1885, p. 126 (similar).

18. Pa. Stat. Ann. (1945) Tit. 18, § 4524, derived from L. 1887, P. L. 38, § 2.

19. Rev. Stat. Wash. (Remington, 1932) § 2459 (2), derived from L. 1909, c. 249, § 207 (2).

20. Wis. Stat. (1945) § 351.38 (4), derived from L. 1901, c. 256.

The following statutes are somewhat similar, but may not necessarily be rendered unconstitutional by the Court's decision in the instant case:

1. Colo. Stat. Ann. (1935) c. 48, § 217, derived from Act of April 9, 1885, p. 172, § 1.

2. Ind. Stat. Ann. (1934) § 2607, derived from L. 1895, c. 109.

3. S. D. Code (1939) § 13.1722 (4), derived from L. 1913, c. 241, § 4.

4. Tex. Stat. (Vernon, 1936), Penal Code, Art. 527, derived from L. 1897, c. 116.

This body of laws represents but one of the many attempts by legislatures to solve what is perhaps the most persistent, intractable, elusive, and demanding of all problems of society—the problem of crime, and, more particularly, of its prevention. By this decision

the Court invalidates such legislation of almost half the States of the Union. The destructiveness of the decision is even more far-reaching. This is not one of those situations where power is denied to the States because it belongs to the Nation. These enactments are invalidated on the ground that they fall within the prohibitions of the "vague contours" of the Due Process Clause. The decision thus operates equally as a limitation upon Congressional authority to deal with crime, and, more especially, with juvenile delinquency. These far-reaching consequences result from the Court's belief that what New York, among a score of States, has prohibited, is so empty of meaning that no one desirous of obeying the law could fairly be aware that he was doing that which was prohibited.

Fundamental fairness of course requires that people be given notice of what to avoid. If the purpose of a statute is undisclosed, if the legislature's will has not been revealed, it offends reason that punishment should be meted out for conduct which at the time of its commission was not forbidden to the understanding of those who wished to observe the law. This requirement of fair notice that there is a boundary of prohibited conduct not to be overstepped is included in the conception of "due process of law." The legal jargon for such failure to give forewarning is to say that the statute is void for "indefiniteness."

But "indefiniteness" is not a quantitative concept. It is not even a technical concept of definite components. It is itself an indefinite concept. There is no such thing as "indefiniteness" in the abstract, by which the sufficiency of the requirement expressed by the term may be ascertained. The requirement is fair notice that conduct may entail punishment. But whether notice is or is not "fair" depends upon the subject matter to which it relates. Unlike the abstract stuff of mathematics, or

the quantitatively ascertainable elements of much of natural science, legislation is greatly concerned with the multiform psychological complexities of individual and social conduct. Accordingly, the demands upon legislation, and its responses, are variable and multiform. That which may appear to be too vague and even meaningless as to one subject matter may be as definite as another subject-matter of legislation permits, if the legislative power to deal with such a subject is not to be altogether denied. The statute books of every State are full of instances of what may look like unspecific definitions of crime, of the drawing of wide circles of prohibited conduct.

In these matters legislatures are confronted with a dilemma. If a law is framed with narrow particularity, too easy opportunities are afforded to nullify the purposes of the legislation. If the legislation is drafted in terms so vague that no ascertainable line is drawn in advance between innocent and condemned conduct, the purpose of the legislation cannot be enforced because no purpose is defined. It is not merely in the enactment of tax measures that the task of reconciling these extremes— of avoiding throttling particularity or unfair generality— is one of the most delicate and difficult confronting legislators. The reconciliation of these two contradictories is necessarily an empiric enterprise largely depending on the nature of the particular legislative problem.

What risks do the innocent run of being caught in a net not designed for them? How important is the policy of the legislation, so that those who really like to pursue innocent conduct are not likely to be caught unaware? How easy is it to be explicitly particular? How necessary is it to leave a somewhat penumbral margin but sufficiently revealed by what is condemned to those who do not want to sail close to the shore of questionable conduct? These and like questions confront legislative

draftsmen. Answers to these questions are not to be found in any legislative manual nor in the work of great legislative draftsmen. They are not to be found in the opinions of this Court. These are questions of judgment, peculiarly within the responsibility and the competence of legislatures. The discharge of that responsibility should not be set at naught by abstract notions about "indefiniteness."

The action of this Court today in invalidating legislation having the support of almost half the States of the Union rests essentially on abstract notions about "indefiniteness." The Court's opinion could have been written by one who had never read the issues of "Headquarters Detective" which are the basis of the prosecution before us, who had never deemed their contents as relevant to the form in which the New York legislation was cast, had never considered the bearing of such "literature" on juvenile delinquency, in the allowable judgment of the legislature. Such abstractions disregard the considerations that may well have moved and justified the State in not being more explicit than these State enactments are. Only such abstract notions would reject the judgment of the States that they have outlawed what they have a right to outlaw, in the effort to curb crimes of lust and violence, and that they have not done it so recklessly as to occasion real hazard that other publications will thereby be inhibited, or also be subjected to prosecution.

This brings our immediate problem into focus. No one would deny, I assume, that New York may punish crimes of lust and violence. Presumably also, it may take appropriate measures to lower the crime rate. But he must be a bold man indeed who is confident that he knows what causes crime. Those whose lives are devoted to an understanding of the problem are certain only that they are uncertain regarding the role of the

various alleged "causes" of crime. Bibliographies of criminology reveal a depressing volume of writings on theories of causation. See, *e. g.,* Kuhlman, A Guide to Material on Crime and Criminal Justice (1929) Item Nos. 292 to 1211; Culver, Bibliography of Crime and Criminal Justice (1927–1931) Item Nos. 877–1475, and (1932–1937) Item Nos. 799–1560. Is it to be seriously questioned, however, that the State of New York, or the Congress of the United States, may make incitement to crime itself an offense? He too would indeed be a bold man who denied that incitement may be caused by the written word no less than by the spoken. If "the Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics," (Holmes, J., dissenting in *Lochner* v. *New York,* 198 U. S. 45, 75), neither does it enact the psychological dogmas of the Spencerian era. The painful experience which resulted from confusing economic dogmas with constitutional edicts ought not to be repeated by finding constitutional barriers to a State's policy regarding crime, because it may run counter to our inexpert psychological assumptions or offend our presuppositions regarding incitements to crime in relation to the curtailment of utterance. This Court is not ready, I assume, to pronounce on causative factors of mental disturbance and their relation to crime. Without formally professing to do so, it may actually do so by invalidating legislation dealing with these problems as too "indefinite."

Not to make the magazines with which this case is concerned part of the Court's opinion is to play "Hamlet" without Hamlet. But the Court sufficiently summarizes one aspect of what the State of New York here condemned when it says "we can see nothing of any possible value to society in these magazines." From which it jumps to the conclusion that, nevertheless, "they are as much entitled to the protection of free speech as

the best of literature." Wholly neutral futilities, of course, come under the protection of free speech as fully as do Keats' poems or Donne's sermons. But to say that these magazines have "nothing of any possible value to society" is only half the truth. This merely denies them goodness. It disregards their mischief. As a result of appropriate judicial determination, these magazines were found to come within the prohibition of the law against inciting "violent and depraved crimes against the person," and the defendant was convicted because he exposed for sale such materials. The essence of the Court's decision is that it gives publications which have "nothing of any possible value to society" constitutional protection but denies to the States the power to prevent the grave evils to which, in their rational judgment, such publications give rise. The legislatures of New York and the other States were concerned with these evils and not with neutral abstractions of harmlessness. Nor was the New York Court of Appeals merely resting, as it might have done, on a deep-seated conviction as to the existence of an evil and as to the appropriate means for checking it. That court drew on its experience, as revealed by "many recent records" of criminal convictions before it, for its understanding of the practical concrete reasons that led the legislatures of a score of States to pass the enactments now here struck down.

The New York Court of Appeals thus spoke out of extensive knowledge regarding incitements to crimes of violence. In such matters, local experience, as this Court has said again and again, should carry the greatest weight against our denying a State authority to adjust its legislation to local needs. But New York is not peculiar in concluding that "collections of pictures or stories of criminal deeds of bloodshed or lust unquestionably can be so massed as to become vehicles for inciting violent and

depraved crimes against the person." 294 N. Y. at 550.
A recent murder case before the High Court of Australia
sheds light on the considerations which may well have
induced legislation such as that now before us, and
on the basis of which the New York Court of Appeals
sustained its validity. The murder was committed by a
lad who had just turned seventeen years of age, and the
victim was the driver of a taxicab. I quote the following
from the opinion of Mr. Justice Dixon: "In his evidence
on the *voir dire* Graham [a friend of the defendant and
apparently a very reliable witness] said that he knew
Boyd Sinclair [the murderer] and his moods very well and
that he just left him; that Boyd had on a number of
occasions outlined plans for embarking on a life of crime,
plans based mainly on magazine thrillers which he was
reading at the time. They included the obtaining of a
motor car and an automatic gun." *Sinclair* v. *The King,*
73 Comm. L. R. 316, 330.

"Magazine thrillers" hardly characterizes what New
York has outlawed. New York does not lay hold of
publications merely because they are "devoted to and
principally made up of criminal news or police reports
or accounts of criminal deeds, regardless of the manner of
treatment." So the Court of Appeals has authoritatively
informed us. 294 N. Y. at 549. The aim of the publi-
cation must be incitation to "violent and depraved crimes
against the person" by so massing "pictures and stories
of criminal deeds of bloodshed or lust" as to encourage
like deeds in others. It would be sheer dogmatism in a
field not within the professional competence of judges to
deny to the New York legislature the right to believe that
the intent of the type of publications which it has pro-
scribed is to cater to morbid and immature minds—
whether chronologically or permanently immature. It
would be sheer dogmatism to deny that in some instances,

as in the case of young Boyd Sinclair, deeply embedded, unconscious impulses may be discharged into destructive and often fatal action.

If legislation like that of New York "has been enacted upon a belief of evils that is not arbitrary we cannot measure their extent against the estimate of the legislature." *Tanner* v. *Little*, 240 U. S. 369, 385. The Court fails to give enough force to the influence of the evils with which the New York legislature was concerned "upon conduct and habit, not enough to their insidious potentialities." *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 364. The other day we indicated that, in order to support its constitutionality, legislation need not employ the old practice of preambles, nor be accompanied by a memorandum of explanation setting forth the reasons for the enactment. See *Woods* v. *Cloyd W. Miller Co.*, 333 U. S. 138, 144. Accordingly, the New York statute, when challenged for want of due process on the score of "indefiniteness," must be considered by us as though the legislature had thus spelled out its convictions and beliefs for its enactment:

> Whereas, we believe that the destructive and adventurous potentialities of boys and adolescents, and of adults of weak character or those leading a drab existence are often stimulated by collections of pictures and stories of criminal deeds of bloodshed or lust so massed as to incite to violent and depraved crimes against the person; and

> Whereas, we believe that such juveniles and other susceptible characters do in fact commit such crimes at least partly because incited to do so by such publications, the purpose of which is to exploit such susceptible characters; and

> Whereas, such belief, even though not capable of statistical demonstration, is supported by our experience as well as by the opinions of some specialists

qualified to express opinions regarding criminal psychology and not disproved by others; and

Whereas, in any event there is nothing of possible value to society in such publications, so that there is no gain to the State, whether in edification or enlightenment or amusement or good of any kind; and

Whereas, the possibility of harm by restricting free utterance through harmless publications is too remote and too negligible a consequence of dealing with the evil publications with which we are here concerned;

Be it therefore enacted that—

Unless we can say that such beliefs are intrinsically not reasonably entertainable by a legislature, or that the record disproves them, or that facts of which we must take judicial notice preclude the legislature from entertaining such views, we must assume that the legislature was dealing with a real problem touching the commission of crime and not with fanciful evils, and that the measure was adapted to the serious evils to which it was addressed. The validity of such legislative beliefs or their importance ought not to be rejected out of hand.

Surely this Court is not prepared to say that New York cannot prohibit traffic in publications exploiting "criminal deeds of bloodshed or lust" so "as to become vehicles for inciting violent and depraved crimes against the person." Laws have here been sustained outlawing utterance far less confined. A Washington statute, directed against printed matter tending to encourage and advocate disrespect for law, was judged and found not wanting on these broad lines:

"We understand the state court by implication at least to have read the statute as confined to encouraging an actual breach of law. Therefore the argument that this act is both an unjustifiable restriction of liberty and too vague for a criminal law must fail.

It does not appear and is not likely that the statute will be construed to prevent publications merely because they tend to produce unfavorable opinions of a particular statute or of law in general. In this present case the disrespect for law that was encouraged was disregard of it—an overt breach and technically criminal act. It would be in accord with the usages of English to interpret disrespect as manifested disrespect, as active disregard going beyond the line drawn by the law. That is all that has happened as yet, and we see no reason to believe that the statute will be stretched beyond that point.

"If the statute should be construed as going no farther than it is necessary to go in order to bring the defendant within it, there is no trouble with it for want of definiteness." *Fox* v. *Washington,* 236 U. S. 273, 277.

In short, this Court respected the policy of a State by recognizing the practical application which the State court gave to the statute in the case before it. This Court rejected constitutional invalidity based on a remote possibility that the language of the statute, abstractly considered, might be applied with unbridled looseness.

Since Congress and the States may take measures against "violent and depraved crimes," can it be claimed that "due process of law" bars measures against incitement to such crimes? But if they have power to deal with incitement, Congress and the States must be allowed the effective means for translating their policy into law. No doubt such a law presents difficulties in draftsmanship where publications are the instruments of incitement. The problem is to avoid condemnation so unbounded that neither the text of the statute nor its subject matter affords "a standard of some sort" (*United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 92). Legislation must put people on notice as to the kind of conduct

from which to refrain. Legislation must also avoid so tight a phrasing as to leave the area for evasion ampler than that which is condemned. How to escape, on the one hand, having a law rendered futile because no standard is afforded by which conduct is to be judged, and, on the other, a law so particularized as to defeat itself through the opportunities it affords for evasion, involves an exercise of judgment which is at the heart of the legislative process. It calls for the accommodation of delicate factors. But this accommodation is for the legislature to make and for us to respect, when it concerns a subject so clearly within the scope of the police power as the control of crime. Here we are asked to declare void the law which expresses the balance so struck by the legislature, on the ground that the legislature has not expressed its policy clearly enough. That is what it gets down to.

What were the alternatives open to the New York legislature? It could of course conclude that publications such as those before us could not "become vehicles for inciting violent and depraved crimes." But surely New York was entitled to believe otherwise. It is not for this Court to impose its belief, even if entertained, that no "massing of print and pictures" could be found to be effective means for inciting crime in minds open to such stimulation. What gives judges competence to say that while print and pictures may be constitutionally outlawed because judges deem them "obscene," print and pictures which in the judgment of half the States of the Union operate as incitements to crime enjoy a constitutional prerogative? When on occasion this Court has presumed to act as an authoritative faculty of chemistry, the result has not been fortunate. See *Burns Baking Co.* v. *Bryan,* 264 U. S. 504, where this Court ventured a view of its own as to what is reasonable "tolerance" in breadmaking. Considering the extent to which the whole domain of psychological inquiry has only recently

been transformed and how largely the transformation is still in a pioneer stage, I should suppose that the Court would feel even less confidence in its views on psychological issues. At all events, it ought not to prefer its psychological views—for, at bottom, judgment on psychological matters underlies the legal issue in this case—to those implicit in an impressive body of enactments and explicitly given by the New York Court of Appeals, out of the abundance of its experience, as the reason for sustaining the legislation which the Court is nullifying.

But we are told that New York has not expressed a policy, that what looks like a law is not a law because it is so vague as to be meaningless. Suppose then that the New York legislature now wishes to meet the objection of the Court. What standard of definiteness does the Court furnish the New York legislature in finding indefiniteness in the present law? Should the New York legislature enumerate by name the publications which in its judgment are "inciting violent and depraved crimes"? Should the New York legislature spell out in detail the ingredients of stories or pictures which accomplish such "inciting"? What is there in the condemned law that leaves men in the dark as to what is meant by publications that exploit "criminal deeds of bloodshed or lust" thereby "inciting violent and depraved crimes"? What real risk do the Conan Doyles, the Edgar Allen Poes, the William Rougheads, the ordinary tribe of detective story writers, their publishers, or their booksellers run?

Insofar as there is uncertainty, the uncertainty derives not from the terms of condemnation, but from the application of a standard of conduct to the varying circumstances of different cases. The Due Process Clause does not preclude such fallibilities of judgment in the administration of justice by men. Our penal codes are loaded with prohibitions of conduct depending on ascertainment through fallible judges and juries of a man's intent or

motive—on ascertainment, that is, from without of a man's inner thoughts, feelings and purposes. Of course a man runs the risk of having a jury of his peers misjudge him. Mr. Justice Holmes has given the conclusive answer to the suggestion that the Due Process Clause protects against such a hazard: "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death." *Nash* v. *United States,* 229 U. S. 373, 377. To which it is countered that such uncertainty not in the standard but in its application is not objectionable in legislation having a long history, but is inadmissible as to more recent laws. Is this not another way of saying that when new circumstances or new insights lead to new legislation the Due Process Clause denies to legislatures the power to frame legislation with such regard for the subject matter as legislatures had in the past? When neither the Constitution nor legislation has formulated legal principles for courts, and they must pronounce them, they find it impossible to impose upon themselves such a duty of definiteness as this decision exacts from legislatures.

The Court has been led into error, if I may respectfully suggest, by confusing want of certainty as to the outcome of different prosecutions for similar conduct, with want of definiteness in what the law prohibits. But diversity in result for similar conduct in different trials under the same statute is an unavoidable feature of criminal justice. So long as these diversities are not designed consequences but due merely to human fallibility, they do not deprive persons of due process of law.

In considering whether New York has struck an allowable balance between its right to legislate in a field that is so closely related to the basic function of government,

and the duty to protect the innocent from being punished for crossing the line of wrongdoing without awareness, it is relevant to note that this legislation has been upheld as putting law-abiding people on sufficient notice, by a court that has been astutely alert to the hazards of vaguely phrased penal laws and zealously protective of individual rights against "indefiniteness." See, *e. g., People* v. *Phyfe,* 136 N. Y. 554, 32 N. E. 978; *People* v. *Briggs,* 193 N. Y. 457, 86 N. E. 522; *People* v. *Shakun,* 251 N. Y. 107, 167 N. E. 187; *People* v. *Grogan,* 260 N. Y. 138, 183 N. E. 273. The circumstances of this case make it particularly relevant to remind, even against a confident judgment of the invalidity of legislation on the vague ground of "indefiniteness," that certitude is not the test of certainty. If men may reasonably differ whether the State has given sufficient notice that it is outlawing the exploitation of criminal potentialities, that in itself ought to be sufficient, according to the repeated pronouncements of this Court, to lead us to abstain from denying power to the States. And it deserves to be repeated that the Court is not denying power to the States in order to leave it to the Nation. It is denying power to both. By this decision Congress is denied power, as part of its effort to grapple with the problems of juvenile delinquency in Washington, to prohibit what twenty States have seen fit to outlaw. Moreover, a decision like this has a destructive momentum much beyond the statutes of New York and of the other States immediately involved. Such judicial nullification checks related legislation which the States might deem highly desirable as a matter of policy, and this Court might not find unconstitutional.

Almost by his very last word on this Court, as by his first, Mr. Justice Holmes admonished against employing "due process of law" to strike down enactments which, though supported on grounds that may not

commend themselves to judges, can hardly be deemed offensive to reason itself. It is not merely in the domain of economics that the legislative judgment should not be subtly supplanted by the judicial judgment. "I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions." So wrote Mr. Justice Holmes in summing up his protest for nearly thirty years against using the Fourteenth Amendment to cut down the constitutional rights of the States. *Baldwin* v. *Missouri,* 281 U. S. 586, 595 (dissenting).

Indeed, Mr. Justice Holmes is a good guide in deciding this case. In three opinions in which, speaking for the Court, he dealt with the problem of "indefiniteness" in relation to the requirement of due process, he indicated the directions to be followed and the criteria to be applied. Pursuit of those directions and due regard for the criteria require that we hold that the New York legislature has not offended the limitations which the Due Process Clause has placed upon the power of States to counteract avoidable incitements to violent and depraved crimes.

Reference has already been made to the first of the trilogy, *Nash* v. *United States, supra.* There the Court repelled the objection that the Sherman Law "was so vague as to be inoperative on its criminal side." The opinion rested largely on a critical analysis of the requirement of "definiteness" in criminal statutes to be drawn from the Due Process Clause. I have already quoted the admonishing generalization that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." 229 U. S. at 377. Inasmuch as "the common law as to restraint of trade" was "taken up" by the Sherman Law, the opinion in the *Nash* case also drew support from the suggestion that language in a criminal statute which might otherwise appear indefi-

nite may derive definiteness from past usage. How much definiteness "the common law of restraint of trade" has imparted to "the rule of reason," which is the guiding consideration in applying the Sherman Law, may be gathered from the fact that since the *Nash* case this Court has been substantially divided in at least a dozen cases in determining whether a particular situation fell within the undefined limits of the Sherman Law.[4] The Court's opinion in this case invokes this doctrine of "permissible uncertainty" in criminal statutes as to words that have had long use in the criminal law, and assumes that "long use" gives assurance of clear meaning. I do not believe that the law reports permit one to say that statutes condemning "restraint of trade" or "obscenity" are much more unequivocal guides to conduct than this statute furnishes, nor do they cast less risk of "estimating rightly" what judges and juries will decide than does this legislation.

The second of this series of cases, *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, likewise concerned anti-trust legislation. But that case brought before the Court a statute quite different from the Sherman Law. However indefinite the terms of the latter, whereby "it throws upon men the risk of rightly estimating a matter of degree," it is possible by due care to keep to the line of safety. But the Kentucky statute was such that no

---

[4] See, *e. g., United States* v. *United Shoe Machinery Co.,* 247 U. S. 32; *United States* v. *United States Steel Corp.,* 251 U. S. 417; *United States* v. *Reading Co.,* 253 U. S. 26; *American Column & Lumber Co.* v. *United States,* 257 U. S. 377; *Maple Flooring Mfrs. Assn.* v. *United States,* 268 U. S. 563; *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588; *United States* v. *Trenton Potteries Co.,* 273 U. S. 392; *Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533; *Associated Press* v. *United States,* 326 U. S. 1; *United States* v. *Line Material Co.,* 333 U. S. 287.

amount of care would give safety. To compel men, wrote Mr. Justice Holmes "to guess on peril of indictment what the community would have given for them [commodities] if the continually changing conditions were other than they are, to an uncertain extent; to divine prophetically what the reaction of only partially determinate facts would be upon the imaginations and desires of purchasers, is to exact gifts that mankind does not possess." 234 U. S. at 223–224. The vast difference between this Kentucky statute and the New York law, so far as forewarning goes, needs no laboring.

The teaching of the *Nash* and the *Harvester* cases is that it is not violative of due process of law for a legislature in framing its criminal law to cast upon the public the duty of care and even of caution, provided that there is sufficient warning to one bent on obedience that he comes near the proscribed area. In his last opinion on this subject, Mr. Justice Holmes applied this teaching on behalf of a unanimous Court, *United States* v. *Wurzbach,* 280 U. S. 396, 399. The case sustained the validity of the Federal Corrupt Practices Act. What he wrote is too relevant to the matter in hand not to be fully quoted:

"It is argued at some length that the statute, if extended beyond the political purposes under the control of Congress, is too vague to be valid. The objection to uncertainty concerning the persons embraced need not trouble us now. There is no doubt that the words include representatives, and if there is any difficulty, which we are far from intimating, it will be time enough to consider it when raised by someone whom it concerns. The other objection is to the meaning of 'political purposes.' This would be open even if we accepted the limitations that would make the law satisfactory to the respondent's counsel. But we imagine that no one not in search of trouble would feel any. Whenever the law draws a line there

will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk. *Nash* v. *United States,* 229 U. S. 373."

Only a word needs to be said regarding *Lanzetta* v. *New Jersey,* 306 U. S 451. The case involved a New Jersey statute of the type that seek to control "vagrancy." These statutes are in a class by themselves, in view of the familiar abuses to which they are put. See Note, 47 Col. L. Rev. 613, 625. Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense. In short, these "vagrancy statutes" and laws against "gangs" are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided.

And so I conclude that New York, in the legislation before us, has not exceeded its constitutional power to control crime. The Court strikes down laws that forbid publications inciting to crime, and as such not within the constitutional immunity of free speech, because in effect it does not trust State tribunals, nor ultimately this Court, to safeguard inoffensive publications from condemnation under this legislation. Every legislative limitation upon utterance, however valid, may in a particular case serve as an inroad upon the freedom of speech which the Constitution protects. See, *e. g., Cantwell* v. *Connecticut,* 310 U. S. 296, and Mr. Justice Holmes' dissent in *Abrams* v. *United States,* 250 U. S. 616, 624. The decision of the Court is concerned solely with the validity of the statute, and this opinion is restricted to that issue.