414 U.S. 955
 94 S.Ct. 265
 38 L.Ed.2d 207
 James M. TRINKLER
v.
State of ALABAMA.
 No. 72-1487.
 Supreme Court of the United States
 October 23, 1973
 
 On petitioner for writ of certiorari to the Court of Criminal Appeals of Alabama.
 Petition for writ of certiorari granted, judgment vacated and case remanded to the Court of Criminal Appeals of Alabama for further consideration in light of Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); United States v. 12 200-ft. Reels of Super 8 mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); Heller v. New York, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); and Alexander v. Virginia, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973).
 On remand, affirmed, 299 So.2d 780.
 Mr. Justice DOUGLAS, with whom Mr. Justice BRENNAN, Mr. Justice STEWART, and Mr. Justice MARSHALL concur, dissenting.
 
 
 1
 The Court today remands this case for reconsideration in light of last June's obscenity decisions. The Alabama Court of Criminal Appeals will now decide whether the publications here are obscene in accordance with standards that no one could have predicted at the time that these publications were sold. It must determine whether the sale of these publications, which were never offered to minors, never displayed publicly to unwilling bystanders, for which purchase was never solicited, could constitutionally be prohibited because they 'appealed to the prurient interest' of the average person applying local community standards, were 'patently offensive' under such standards, and lacked 'serious' literary, artistic, political or scientific value. (413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419.)
 
 
 2
 Just recently this Court reiterated that '[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'
 
 
 3
 'Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what it prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policeman, judges and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'[1]
 
 
 4
 The exceptions to the First Amendment written into the Constitution by the majority, which we now ask the court below to apply on remand, could not more clearly exhibit these evils of vagueness. Following the old Roth[2] standards, the Court adopted the approach in Redrup[3] of deciding each case on an ad hoc basis without attempt to offer guidance for future adjudications. A new majority of five now tries again, with reworked Roth standards which allow much freer reign to the predilections of local authorities. But this greater latitude only exacerbates the problem of vagueness.
 
 
 5
 Every author, every bookseller, every movie exhibitor, and perhaps, every librarian is now at the mercy of the local police force's conception of what appeals to the 'prurient interest' or is 'patently offensive.' The standard can vary from town to town and day to day in an unpredictable fashion.[4] How can an author or bookseller or librarian know whether the community deems his books acceptable until after the jury renders its verdict? The meaning of the standards necessarily vary according to each person's own idiosyncracies. The standards fail to give adequate notice and invite arbitrary exercise of police power. The evil is multiplied because of the danger to First Amendment values of free expression. 'Bookselling should not be a hazardous profession.' (Ginsberg v. New York, 390 U.S. 629, 674, 88 S.Ct. 1274, 20 L.Ed.2d 195 (Fortas, J., dissenting).)
 
 
 6
 If the magazines in question were truly 'patently offensive' to the local community, there would be no need to ban them through the exercise of police power; they would be banned by the marketplace which provided no buyers for them. Thus it must be the case that some substantial portion of the public not only found them not offensive, but worthy of purchase. How can the bookseller or librarian be sure which of the publications on his shelves are offensive to the majority? Perhaps he will be safe if he sells only publications with a certified history of broad appeal, thus attempting to 'steer wide of the unlawful zone.' Yet there are many who deem some magazines offensive and even lingerie advertisements in the Sunday papers. A bookseller or a librarian can never know if some jury will find those views representative of the community. A movie exhibitor in Georgia has just found himself convicted under that State's obscenity laws for showing a film which received much critical acclaim, and an Oscar nomination for the female lead.[5] We deal here with criminal prosecutions under which a man may lose his liberty. Our Constitution requires fair notice so that the law-abiding can conform their conduct to the requirements of the law.
 
 
 7
 This requirement is not new, and state enactments attempting to proscribe publication of certain content have run afoul of it before. In Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948), the Court considered a New York law which, after the gloss placed upon it by the New York courts, prohibited as obscene the publication of 'collections of criminal deeds of bloodshed or lust '. . . so massed as to become vehicles for inciting violent and depraved crimes against the person. . . ." (Id., at 513, 68 S.Ct. 665.) In affirming the conviction the New York court noted that '[i]n the nature of things there can be no more precise test of written indecency or obscenity than the continuing and changeable experience of the community as to what types of books are likely to bring about the corruption of public morals. . . .' (Id., at 514, 68 S.Ct. 665.) The New York court concluded '. . . when reasonable men may fairly classify a publication as necessarily or naturally indecent or obscene, a mistaken view by the publisher as to its character or tendency is immaterial.' (Ibid.) But this Court disagreed; it did not find the 'continuing and changeable experience of the community' adequate specification to support a criminal conviction, for 'men of common intelligence' would have to guess at the meaning of the prohibition against publication of stories 'so massed as to become vehicles for inciting violent and depraved crimes.' (Id., at 518-519, 68 S.Ct. 665.)
 
 
 8
 The standards of Miller are not better. I dissent.
 
 
 9
 Mr. Justice BRENNAN, with whom Mr. Justice STEWART and Mr. Justice MARSHALL join, dissenting.
 
 
 10
 Petitioner was convicted on charges of distributing allegedly obscene materials in violation of Title 14, § 374(4)(1), of the Code of Alabama of 1940, as amended, which provides:
 
 
 11
 'Every person who, with knowledge of its contents, sends or causes to be sent, or brings or causes to be brought, into this state for sales or commercial distribution, or in this state prepares, sells, exhibits or commercially distributes, or gives away or offers to give away, or has in his possession with intent to sell or commercially distribute, or to give away or offer to give away, any obscene printed or written matter or material, other than mailable matter, or any mailable matter known by such person to have been judicially found to be obscene under this chapter, shall be guilty of a misdemeanor and, upon conviction, shall be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than one year, and may be fined not more than two thousand dollars for each offense, or be both so imprisoned and fined in the discretion of the court.'
 
 
 12
 It is my view that, 'at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the state and federal governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly 'obscene' contents.' Paris Adult Theatre I v. Slaton, 413 U.S. 49, 113, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). It is clear that, tested by that constitutional standard, § 374(4) is constitutionally overbroad and therefore invalid on its face. For the reasons stated in my dissent in Miller v. California, 413 U.S. 15, 47, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), I would therefore grant certiorari, vacate the judgment of the Alabama Court of Criminal Appeals and remand for further proceedings not inconsistent with my Paris Adult dissent. In that circumstance, I have no occasion to consider whether the other questions presented merit plenary review. See Heller v. New York, 413 U.S. 494, 495, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973).
 
 
 
 [1]
 Grayned v. City of Rockford, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (internal cites and quotes omitted). See also the cases cited id., at 108-109, nn. 3-5.
 
 
 [2]
 Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).
 
 
 [3]
 Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967). See the dissenting opinion of Mr. Justice Brennan in Paris Adult Theatre I v. Slaton, 413 U.S. 49, 73, at 83, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).
 
 
 [4]
 The Dean of the Columbia University School of Library Science predicted that as a result of these vague standards 'booksellers as well as librarians will act as self-censors of their collections—out of fear.' Librarians Vote Smut Ruling Fund, New York Times, July 25, 1973, at p. 46, col. 1. The Executive Secretary of the American Booksellers Association noted that the standards subject the legitimate bookseller to fear of prosecution because he would not know which books the local authorities might deem obscene. (Ibid.) An executive of the American Library Association has reported that thousands of books have been returned to suppliers because of the booksellers fear of prosecution. (Ibid.)
 
 
 [5]
 Jenkins v. The State, 230 Ga. 726, 199 S.E.2d 183 (1973). The movie, Carnal Knowledge, received an 'R', not an 'X' rating from the M. P. A. A. See No Evil, Time, July 16, 1973, at p. 73. The President of the Motion Picture Association of America, noting that the film is a 'serious work,' complained that the Court's standards have left motion picture producers 'in a no man's land.' What the Court Has Done to Movies, New York Times, August 17, 1973, at p. 15, col. 1.