[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 469 
Amanda Ellen O'Callaghan was indicted for, and convicted of, unlawful manufacture of a controlled substance in the first degree, a violation of § 13A-12-218, Ala. Code 1975.[1]
She was sentenced to 10 years' imprisonment.[2] O'Callaghan raises four issues on appeal:
 (1) Whether § 13A-12-218, Ala. Code 1975, is unconstitutionally void for vagueness because the statute fails to state whether a clandestine laboratory operation must be intended to operate in the county where the arrest and prosecution occurred.
 (2) Whether the trial court committed reversible error when it ruled that venue is not a jury question and instructed the jury that it did not have to find that the alleged "lab" had to be intended for use in Jefferson County.
 (3) Whether the trial court erred by denying her motion for a judgment of acquittal on the ground that the State failed to prove that the alleged clandestine laboratory operation either was to take place or did take place within 500 feet of a residence, place of business, church, or school and that only one precursor material was found.
 (4) Whether the trial court erred by overruling her objection to the State's evidence of other criminal acts, offered pursuant to Rule 404(b), Ala.R.Evid., when the State did not disclose the Rule 404(b) evidence after she had requested in her discovery motion that the State provide any and all information concerning *Page 470 
her prior criminal record, including, but not limited to, arrests, convictions, periods of incarceration, and present probationary and parole status.
The evidence adduced at trial indicated the following. Brian Cochran, a patrol officer with the Warrior Police Department, testified that at approximately 11:30 p.m. on April 8, 2003, he was patrolling the northbound section of Interstate 65 located within the Warrior city limits and that this area is located within the Birmingham Division of Jefferson County. Officer Cochran testified that he was at mile marker 280, which was in a construction zone, when he saw a blue and silver GMC 1500 pickup truck traveling 65 miles per hour in a 55-mile-per-hour construction zone; that he noticed that the pickup truck did not have a rearview mirror on the inside of the vehicle and that it had a cracked wind-shield; that he began to follow the pickup truck and noticed that it was weaving within its lane; that he did not activate his lights and attempt to pull over the pickup truck until mile marker 282 because, he said, mile marker 282 is a safer area in which to execute a traffic stop on that portion of the interstate; and that, although the driver pulled the pickup truck into the emergency lane and turned on the truck's hazard lights, the driver continued to travel approximately one mile before stopping the pickup truck. Officer Cochran also testified that Alabama Plastics, a manufacturing company that operates 24 hours a day, 7 days a week, was located within 200 feet of the interstate when he initially observed the pickup truck at mile marker 280 on Interstate 65 North.
Officer Cochran stated that for his safety, he made a passenger-side approach to the pickup truck, tapped on the window and requested that the driver roll down the passenger-side window. The driver indicated that the window would not roll down, and the driver told the passenger to open the door. Officer Cochran testified that when the passenger-side door opened, he "was immediately overwhelmed with the strong chemical odor of ether emitting from the vehicle" (R. 21) and that he "explained the reason for the stop to the driver and requested driver's license, proof of registration and insurance." (R. 23.) Officer Cochran learned that the driver was William Harold Lamb and that the passenger was Lamb's wife, Amanda O'Callaghan.
Officer Cochran stated that both occupants of the pickup truck appeared very nervous. Specifically, he testified that O'Callaghan, seated in the passenger's seat, was "staring straight ahead" (R. 24); that she had a small dog sitting in her lap and "she was stroking [the dog's] head very rapidly and very hard" (R. 24); and that when he jokingly asked her if the dog was an attack dog, she did not respond but "continued to stare straight ahead and rapidly stroke the dog's head." (R. 25.) Officer Cochran stated that as he issued Lamb a warning citation "for vision obstruction, no rearview mirror and improper lane change for the weaving across the roadway" (R. 26), Lamb explained that he had been driving all day so he was sleepy and tired. Officer Cochran returned Lamb's documents to him and told him that he was free to leave. Officer Cochran then asked Lamb if he could ask him some questions, and Lamb said that he could. Officer Cochran stated that during the course of this conversation, he requested permission to search the pickup truck and Lamb consented to a search of the vehicle.
Officer Cochran testified that the search of the "back floorboard" of the pickup truck revealed two jars that contained a clear liquid that had the odor of ether; that he placed both Lamb and O'Callaghan under arrest for "a meth production lab in *Page 471 
process" (R. 28-29); and that he called for assistance from Detective Corey Archer, a narcotics investigator with the Warrior Police Department, who responded to the scene. Det. Archer then contacted the Drug Enforcement Administration ("DEA") for assistance in recovering and processing the evidence from the pickup truck. (R. 82-84, 114.) Officer Cochran testified that the DEA agents put on chemical protective masks and rubber gloves to search the pickup truck. (R. 28-30.) Jim Henderson, a Birmingham police officer who was assigned to the DEA on April 8, 2003, testified that he and other DEA agents were called to the scene on the interstate in Warrior because, he said, the authorities "believed that they had a meth lab and [he was] lab certified" — meaning that he knew what to look for to determine if it was a meth lab and how to safely process the evidence. (R. 114-16.) Officer Henderson stated that in light of the items found at the scene on April 8, 2003, this was "an inactive lab" meaning that "they had the ingredients to conduct a lab with used coffee filters and the crushed tablets" and that it was ready "to be set up and continued wherever." (R. 122.)
Officer Henderson stated that the Occupational Safety and Health Administration classifies meth labs as hazardous and contaminated sites and that he contacted a hazardous material ("HAZMAT") crew to assist in cleaning up the materials recovered from the pickup truck. (R. 30-31, 116-17.) Officer Cochran also testified that they had to close "a portion of the interstate there for safety reasons." (R. 30.) Officer Henderson testified that the lithium strips used in the production of methamphetamine are dangerous because, he said, "[i]f lithium contacts with any moisture including the air, it will ignite." (R. 121-22.)
Officer Cochran testified that the following items were recovered during the search of the pickup truck on April 8, 2003: inside the truck — the two jars with clear liquid that he initially had observed, one of which had "what appeared to be ephedrine pills, crushed ephedrine pills in the bottom" (R. 31); "coffee filters with residue" (R. 38);
 "[f]rom a bag that was within the vehicle, a makeup-type bag that contained makeup, . . . [w]e recovered a 16-ounce bottle of hydrogen peroxide, a large bag containing several small Ziploc [brand plastic] baggies, a set of postage scales, a pipe cutter, a Ziploc [brand plastic] bag that contained lithium strips, a one-pound-ten-ounce can of table salt, [and] strips of aluminum foil with an unknown residue on them"
(R. 38); and in the bed of the truck — a propane tank; "three fuel burners like a camping fuel burner type of stove thing" (R. 40); "a one-gallon can of a Liquid Fire drain opener" (R. 40); "[r]ubber tubing and some more Ziploc [brand plastic] bags with an unknown residue in them" (R. 40); and
 "two plastic bags which contained several empty bottles with liquid residue and a can of table salt, another can of table salt, rubber gloves, a common household type of tea or Kool-Aid [brand] pitcher that contained a plastic bag containing some unknown crushed pill."
(R. 40.) Officer Cochran stated that in addition to the items described above, the makeup bag found inside the pickup truck contained "[m]akeup and hair brushes and personal-type stuff that a female would probably use" (R. 39); that this was the only makeup bag found in the truck; and that when he asked her about the makeup bag, O'Callaghan told him that it was her bag. *Page 472 
Det. Archer testified that he removed a plastic bag containing a crushed powder substance (State's Exhibit 19) from the scene on April 8, 2003; that this exhibit remained in his care, custody, and control from the time he removed it from the scene until he placed it in the evidence locker at the Warrior Police Department; and that on April 9, 2003, he removed it from the evidence locker and delivered it to the Department of Forensic Sciences ("DFS") for analysis. Det. Archer stated that he also removed some aluminum foil (State's Exhibit 20) and coffee filters (State's Exhibit 21) from the scene, that he placed those items in the evidence locker, and that on April 9, 2003, he removed those items from the evidence locker and delivered all the items to DFS for analysis.
Dan Matteo, a forensic drug chemist at DFS, testified that Det. Archer delivered State's Exhibits 19, 20, and 21 to DFS on April 9, 2003, and that he analyzed the contents of those exhibits between July 23, 2003, and August 1, 2003. Matteo stated that his analysis of those exhibits revealed that the crushed tablets contained in State's Exhibit 19 was ephedrine, which is a precursor substance (R. 99); that the residue on State's Exhibit 20 (the aluminum foil) was methamphetamine (R. 101); and that State's Exhibit 21 (the coffee filters) contained methamphetamine residue. (R. 103.) Matteo stated that while ephedrine is not a controlled substance like pseudoephedrine, ephedrine is very similar to pseudoephedrine and it is a precursor substance. (R. 98-99.) Matteo testified that in his opinion, ephedrine or pseudoephedrine is "a great precursor" because, he said, "it's so similar to methamphetamine" and "it's got everything you need." (R. 104-05.) Matteo also testified that coffee filters, a drain opener, anhydrous ammonia, a hot plate or fuel burner, and lithium are all items commonly used in the production of methamphetamine. (R. 105-08.)
Pursuant to Rule 404(b), Ala.R.Evid., the State also presented evidence regarding O'Callaghan's subsequent arrest for unlawful manufacture of a controlled substance. Greg Carr, a narcotics and violent crime investigator with the 24th Judicial Circuit Drug Task Force, testified that he is responsible for investigating crimes associated with illegal narcotic activity and that at approximately 10:00 p.m. on May 1, 2003, he was called to a residence located at 141 ½ 14th Avenue Southwest in Reform, Alabama, to investigate possible illegal narcotic activity. He stated that when he arrived, seven people were inside this residence — Amanda O'Callaghan, Joshua O'Callaghan, Ricky Biers, Damon Mixon, Kenneth Jones, a juvenile by the name of Julie, and an eight-week-old infant. Inv. Carr testified that they were given consent to search the residence and that during the search the officers recovered approximately a gram of methamphetamine from a cigarette carton. He stated that during the search, Amanda O'Callaghan was sitting on the couch and that when she was removed from the couch they discovered that she had been sitting on a Marlboro brand cigarette carton and that this cigarette carton contained approximately a gram of methamphetamine. (R. 148.) During the search, they also discovered several boxes of pseudoephedrine cold medicine in the bathroom closet and two bottles of "Heet," which contains methanol,[3] in a black duffel bag found in the *Page 473 
bedroom. Inv. Carr stated that Amanda O'Callaghan's purse was also found inside this black duffel bag. Inv. Carr testified that after this search on May 1, 2003, Amanda O'Callaghan was arrested and charged with unlawful manufacture of a controlled substance in the first degree, unlawful manufacture of a controlled substance in the second degree, and possession of a controlled substance. (R. 154.)
Section 13A-12-218, Ala. Code 1975, states:
 "(a) A person commits the crime of unlawful manufacture of a controlled substance in the first degree if he or she violates Section 13A-12-217 and two or more of the following conditions occurred in conjunction with that violation:
 . . . .
 "(4) A clandestine laboratory operation was to take place or did take place within 500 feet of a residence, place of business, church, or school.
 . . . .
 "(6) A clandestine laboratory operation was for the production of controlled substances listed in Schedule I or Schedule II."
Section 13A-12-217, Ala. Code 1975, states:
 "(a) A person commits the crime of unlawful manufacture of a controlled substance in the second degree if, except as otherwise authorized in state or federal law, he or she does any of the following:
 . . . .
 "(2) Possesses precursor substances as determined in Section 20-2-181, in any amount with the intent to unlawfully manufacture a controlled substance."
Section 13A-1-2(3), Ala. Code 1975, defines the term "clandestine laboratory operation" as any of the following:
 "a. Purchase or procurement of chemicals, supplies, equipment, or laboratory location for the unlawful manufacture of controlled substances.
 "b. Transportation or arranging for the transportation of chemicals, supplies, or equipment for the unlawful manufacture of controlled substances.
 "c. Setting up of equipment or supplies in preparation for the unlawful manufacture of controlled substances.
 "d. Distribution or disposal of chemicals, equipment, supplies, or products used in or produced by the unlawful manufacture of controlled substances."
(Emphasis added.)
 I.
O'Callaghan first contends that § 13A-12-218, Ala. Code 1975, is "unconstitutionally void for vagueness" because, she argues, "the statute fails to state whether a clandestine laboratory must be intended to operate in the county where the arrest and prosecution occurred." (O'Callaghan's brief at p. 18.) Specifically, she argues:
 "Section 13A-12-218 states that a person is guilty of manufacture of a controlled substance if their clandestine lab-oratory operation was used, or was intended for use, within 500 feet of a residence, place of business, school or church.
 "In the present case, [O'Callaghan] was arrested while driving on an inter-state highway, and the alleged clandestine laboratory operation was non-operational.
 "The Statute is void for vagueness in that it fails to state whether the alleged lab must operate, or be intended to operate, in the county of arrest and prosecution. In the present case, there was no evidence whatever that [O'Callaghan] intended to operate anything in the State of Alabama, or in Jefferson County. Since the statute is silent on the subject, *Page 474 
it fails to inform the ordinary person as to what behavior is being proscribed with sufficient definiteness. . . .
 "Since the statute fails to state whether the lab must be intended for use in the county of arrest and prosecution, then it should be declared void for vagueness."
(O'Callaghan's brief at p. 15; emphasis added.)
 "`"The doctrine of vagueness . . . originates in the due process clause of the Fourteenth Amendment, see Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and is the basis for striking down legislation which contains insufficient warning of what conduct is unlawful, see United States v. National Dairy Products Corporation, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).
 "`"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989, 996
(1954). A vague statute does not give adequate `notice of the required conduct to one who would avoid its penalties,' Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367, 371 Q952), is not `sufficiently focused to forewarn of both its reach and coverage,' United States v. National Dairy Products Corporation, 372 U.S. at 33, 83 S.Ct. at 598, 9 L.Ed.2d at 566, and `may trap the innocent by not providing fair warning,' Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227-28 (1972).
 "`"As the United States Supreme Court observed in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948):
 "`"`There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt.'
 "`"333 U.S. at 515-16, 68 S.Ct. at 670, 92 [L.Ed, at] 849-50 [citations omitted]."
 "`McCrary v. State, 429 So.2d 1121, 1123-24
(Ala.Cr.App. 1982), cert. denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983).'
 "McCall v. State, 565 So.2d 1163, 1165
(Ala.Crim.App. 1990).
 "`"`As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' Kolender v. Lawson, 461 U.S. 352 [357], 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). A statute challenged for vagueness must therefore be scrutinized to determine whether it provides both fair notice to the public that certain conduct is proscribed and minimal guidelines to aid officials in the enforcement of that proscription. See Kolender, supra; Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)."'
 . . . .
 ". . . . The judicial power to declare a statute void for vagueness `should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or *Page 475 
so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended.' Jansen v. State ex rel. Downing, 273 Ala. 166, 170, 137 So.2d 47, 50
(1962)."
Vaughn v. State, 880 So.2d 1178, 1194-96
(Ala.Crim.App. 2003).
Although § 13A-12-218 does not specifically address venue, § 15-2-2, Ala. Code 1975, states that "[u]nless otherwise provided by law, the venue of all public offenses is in the county in which the offense was committed." A person of ordinary intelligence could understand that the venue for a violation of § 13A-12-218 is in the county where the clandestine laboratory operation took place and where the defendant possessed a precursor substance with the intent to manufacture a controlled substance. In the present case, the evidence showed that O'Callaghan was involved in transporting the chemicals, supplies, and equipment necessary for the manufacture of methamphetamine on Interstate 65, which runs through Jefferson County, and that she possessed ephedrine, a precursor substance. (R. 99.) As previously noted, one of the definitions of "clandestine laboratory operation" is the "[t]ransportation . . . of chemicals, supplies, or equipment for the unlawful manufacture of controlled substances." § 13A-1-2(3)b. Thus, we do not find § 13A-12-218 unconstitutionally void for vagueness.
 II.
O'Callaghan next contends that "the trial court committed reversible error when it ruled that venue is not a jury question and instructed the jury that it did not have to find that the alleged `lab' had to be intended for use in Jefferson County." (O'Callaghan's brief at p. 22.)
During its deliberations, the jury sent the trial court several questions. One of these questions was: "To convict in Jefferson [County] does the meth lab intent to set up have to be in Jefferson County?" (R. 268.) The trial court heard arguments from the parties regarding this question posed by the jury. The State's position was that "the transporting of the chemicals has to be within Jefferson County" but that "where you set [an operational meth lab] up does not have to take place here" in Jefferson County. (R. 271.) O'Callaghan's position was that "in order to be in violation of the law if they are looking at where a meth lab was to be set up, it's going to have to be established somehow that it had to be set up in Jefferson County." (R. 268-69.) After hearing the parties' positions, the trial court stated:
 "I'm going to answer this no. And I'm going to give you an exception, [O'Callaghan's attorney]. . . . But to me the only common sense application of this statute, understanding the way that people transport drugs through different counties in this state, the only logical construction to me is that the intent to set up this lab does not have to be in Jefferson County. It could be in any county, as far as I'm concerned, in this state. It's still a danger."
(R. 271.)
It appears that O'Callaghan's argument is based on an erroneous interpretation of the law — that an operational "meth lab" must actually be set up in Jefferson County or that there be the intent to set up an operational "meth lab" in Jefferson County for a person to be prosecuted and convicted in Jefferson County under § 13A-12-218. However, this interpretation ignores the fact that one of the definitions of a "clandestine laboratory operation" is the "[t]ransportation . . . of chemicals, supplies, or equipment for the unlawful manufacture *Page 476 
of controlled substances." § 13Al-2(3)b. The transportation of the items necessary to manufacture methamphetamine occurred in Jefferson County; thus, the evidence established that there was a clandestine laboratory operation in Jefferson County. Therefore, the jury did not have to find that O'Callaghan either set up an operational "meth lab" in Jefferson County or intended to set up an operational "meth lab" in Jefferson County in order to convict O'Callaghan under §13A-12-218.
In light of the foregoing, we find that the trial court correctly answered the jury's question in the negative.
 III.
O'Callaghan contends that the trial court erred when it denied her motion for a judgment of acquittal because, she says, the State failed to prove that "the alleged clandestine laboratory operation was to take place, or did take place, within 500 feet of a residence, place of business, church, or school" and that "only one precursor material was found." (O'Callaghan's brief at p. 24.) Specifically, O'Callaghan argues:
 "In the present case, the indictment set forth the elements of the offense that the State had to prove for a conviction. One of the elements that the State had to prove was that a clandestine laboratory operation was to take place, or did take place, within 500 feet of a residence, place of business, church, or school. (C. 10.)
 "The State failed to produce any evidence whatever of where the operation was intended to take place. The indictment in this case tracks the language of Section 13A-12-218(4) Code of Alabama (1975). The statute does not state that the arrest location of a non-operational lab (R. 123-125) can satisfy the element that the operation either did take place, or was to take place, within 500 feet of the enumerated buildings."
(O'Callaghan's brief at p. 25.)
However, this argument again ignores the fact that one of the definitions of a "clandestine laboratory operation" is the "[t]ransportation . . . of chemicals, supplies, or equipment for the unlawful manufacture of controlled substances." § 13Al-2(3)b. In the present case, the evidence presented at trial showed that O'Callaghan was involved in transporting the chemicals, supplies, and equipment necessary for the manufacture of methamphetamine on Interstate 65, which runs through Jefferson County. As previously noted, Officer Cochran testified that Alabama Plastics, a manufacturing company that operates 24 hours a day, 7 days a week, was located within 200 feet of the interstate when he initially observed the pickup truck at mile marker 280 on Interstate 65 North. Thus, there was sufficient evidence presented to establish that there was a clandestine laboratory operation in Jefferson County within 500 feet of a business. Therefore, the State did not have to present evidence proving either that O'Callaghan set up an operational "meth lab" in Jefferson County or that she intended to set up an operational "meth lab" in Jefferson County in order to obtain a conviction of O'Callaghan under § 13A-12-218.
O'Callaghan also argues that the State did not present sufficient evidence to obtain a conviction because, she says, the State presented evidence that only one precursor substance was found in the pickup truck while §13A-12-217(a)(2), Ala. Code 1975, plainly states that the defendant must possess "precursor substances." (Emphasis added.) She argues that "[i]f the legislature had intended to allow the discovery of a single item to be sufficient, then the statute would read `material' as *Page 477 
opposed to `materials.'"[4] (O'Callaghan's brief at pp. 27-28.) However, § 1-1-2, Ala. Code 1975, provides that for words used in the Alabama Code, "[t]he singular includes the plural, and the plural the singular."
Additionally, before the legislature's passage of §13A-12-217(a)(2) in 2001, § 20-2-190(b), Ala. Code 1975,[5]
was already in effect. It stated:
 "A person who possesses, sells, transfers, or otherwise furnishes a listed precursor chemical commits an offense if the person possesses, sells transfers, or furnishes the substance with the knowledge or intent that the substance will be used in the unlawful manufacture of a controlled substance. An offense under this subsection shall constitute a Class B felony."
(Emphasis added.) There is no indication that the legislature, in the face of a growing methamphetamine epidemic at the time of the enactment of § 13A-12-217 in 2001, intended to relax the threshold and require the possession of more than one precursor substance used in the manufacture of methamphetamine in order to establish that a person has committed the crime of unlawful manufacture of a controlled substance.
Because the State presented evidence indicating that O'Callaghan was involved in transporting the chemicals, supplies, and equipment necessary for the manufacture of methamphetamine within 500 feet of a business and that O'Callaghan was in possession of a precursor substance, the trial court properly denied her motion for a judgment of acquittal.
 IV.
O'Callaghan also contends that the trial court erred when it overruled her objection to Inv. Carr's testimony on Rule 404(b) grounds because, she says, the State did not disclose this evidence before trial even though she had requested in her discovery motion that the State provide any and all information concerning her prior criminal record, including, but not limited to, arrests, convictions, periods of incarceration, and present probationary or parole status.
Before the testimony of Inv. Carr — who testified at trial regarding O'Callaghan's subsequent arrest on May 1, 2003, for the unlawful manufacture of a controlled substance in the first degree — O'Callaghan objected and requested that Inv. Carr not be allowed to testify on the grounds that she had not received pretrial disclosure under Rule 404(b), Ala.R.Evid., of the State's intent to use this evidence. Rule 404(b), Ala.R.Evid., states:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *Page 478 
identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
(Emphasis added.)
O'Callaghan argued at trial, as she does on appeal, that in her discovery motion filed with the trial court she made the following request:
 "4. Any and all information about the Defendant's prior criminal record, including, but not limited to, arrests, convictions, periods of incarceration and present probationary or parole status."
(C. 23), and that this request was, in effect, a request for Rule 404(b) information. (R. 136-37, O'Callaghan's brief at p. 29.) The trial court disagreed that this was a request for Rule 404(b) evidence, and it allowed Officer Carr to testify at trial. (R. 137.)
On appeal, O'Callaghan makes the following argument:
 "[Ex parte] Davis[, 875 So.2d 276
(Ala. 2003)] establishes the fact that, contrary to the opinion of the trial court, a [Rule] 404(b)[, Ala.R.Evid.,] motion can be contained in the defense's discovery request. The only requirement for enforcement is that the motion must be filed with the trial court.
 "In the present case, the defense filed the discovery request with the trial court, well in advance of trial, and the State failed to respond to the request within fourteen (14) days as required by the Alabama Rules of Criminal Procedure.
 "Since the State failed to provide pretrial disclosure of the [Rule] 404(b) evidence, the trial court erred by allowing the evidence to be presented to the jury through the testimony of Officer Carr."
(O'Callaghan's brief at pp. 30-31.) However, this argument misconstrues the trial court's ruling on this objection.
At trial, the following exchange occurred between O'Callaghan's attorney and the trial court:
 "THE COURT: Well, I don't know what they intend on doing. But if number four is what you're referring to, it doesn't request [Rule] 404(b) evidence, [O'Callaghan's attorney].
 "[O'Callaghan's attorney]: Judge, it does not specifically say [Rule] 404(b). But it enumerates what I've asked for the State to give me.
 "THE COURT: It says prior criminal record, arrest, convictions, periods of incarceration in prison, probationary and parole status.
 "[O'Callaghan's attorney]: Yes, sir.
 "THE COURT: That's not 404(b) evidence. Is this [testimony] in the nature of 404(b) evidence?
 "[Prosecutor]: Yes, sir, it is.
 "THE COURT: What would it be?
 "[Prosecutor]: I'm offering this witness's testimony to prove knowledge and intent because those have been issues brought out by the defense."
(R. 137.) It is clear that the basis for the trial court's ruling was not that a request for Rule 404(b) evidence could not be contained in a discovery motion, but that O'Callaghan's request in her discovery motion was not a request for Rule 404(b) evidence. In Ex parte Davis, 875 So.2d 276
(Ala. 2003), the Alabama Supreme Court stated:
 "The record indicates that Davis served the prosecutor with a copy of his discovery motion and that included in the motion was Davis's request that the *Page 479 State inform him of the general nature of all evidence of other crimes, wrongs, or acts the State intended to introduce at trial."
875 So.2d at 277 (emphasis added).
In Huffman v. State, 706 So.2d 808
(Ala.Crim.App. 1997), this Court determined that evidence of Huffman's conviction for third-degree theft was properly admitted based, in part, on a finding that Huffman "did not make a specific pretrial request for the state to provide notice of any prior convictions that it intended to introduce in evidence at trial."706 So.2d at 814. In the present case, as in Huffman, O'Callaghan did not make a specific pretrial request for Rule 404(b) material. Moreover, O'Callaghan's request was for information regarding her prior criminal record; however, the Rule 404(b) evidence introduced by the State concerned O'Callaghan's arrest subsequent to the present crime. Clearly then, O'Callaghan's request did not cover the evidence introduced by the State. Thus, the trial court correctly allowed the State to present the testimony of Officer Carr.
 V.
Based on the foregoing, we affirm O'Callaghan's conviction for unlawful manufacture of a controlled substance in the first degree. However, we must remand this case for the trial court to set aside that part of its order imposing a $1,000 fine pursuant to the Demand Reduction Assessment Act, § 13A-12-281(a), Ala. Code 1975, which provides:
 "In addition to any disposition and fine authorized by Sections 13A-12-202, 13A-12-203, 13A-12-204, 13A-12-211, 13A-12-212, 13A-12-213, 13A-12-215, and 13A-12-231, or any other statute indicating the dispositions that can be ordered for such a conviction or an adjudication of delinquency, every person convicted of, or adjudicated delinquent for, a violation of any offense defined in the sections set forth above, shall be assessed for each such offense an additional penalty fixed at $1,000 for first offenders and $2,000 for second and subsequent offenders."
This section does not authorize an additional penalty for persons convicted of violating § 13A-12-218, as O'Callaghan was. Therefore, although we affirm O'Callaghan's conviction, we remand this case for the trial court to set aside its imposition of the $1,000 fine pursuant to § 13A-12-281. Due return shall be filed with this Court within 21 days of the date of the opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.*
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] The indictment alleged that O'Callaghan
 "did possess precursor substances with the intent to unlawfully manufacture a controlled substance, to-wit: METHAMPHETAMINE, and a clandestine laboratory operation was to take place or did take place within 500 feet of a residence, place of business, church or school and the clandestine laboratory operation was for the production of controlled substances listed in Schedule I or II, to-wit: METHAMPHETAMINE, in violation of Section 13A-12-218 of the Alabama Criminal Code."
(C. 10.)
[2] O'Callaghan was initially sentenced as a habitual felony offender to life imprisonment. (C. 6.) However, she filed a motion to reduce her sentence, contending that the State did not adequately prove that the prior convictions from Mississippi constituted felonies in Alabama when those offenses were committed. (C. 48-49.) The trial court agreed that the State "has failed to prove the three (3) prior felonies . . . as mandated by caselaw" (C. 5), and it granted O'Callaghan's motion and reduced her sentence to 10 years' imprisonment.
[3] Officer Carr also testified that when he opened the two bottles of Heet, he "found them to contain what is known as a pill soak" which is "where pseudoephedrine pills are crushed and mixed in with methanol in preparation to be used in a methamphetamine cook." (R. 153.)
[4] Section 13A-12-217(a)(2) refers to "substances" rather than "materials." However, it appears that O'Callaghan is arguing that this statute requires the possession of more than one precursor substance and that the State's evidence was not sufficient to convict her under this statute because the State discovered only one precursor substance in the pickup truck.
[5] We recognize that § 20-2-190, Ala. Code 1975, was amended in 2004 to create the Alabama Methamphetamine Abuse Task Force. However, the amended version of § 20-2-190(b) continued to refer to "a listed precursor chemical" (emphasis added) in the singular and added the phrase "or a product containing a precursor chemical." (Emphasis added.) The amended version of § 20-2-190(b) also continued to refer to "the substance" in the singular.
* Note from the reporter of decisions: On March 17, 2006, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On April 14, 2006, that court denied rehearing, without opinion. On June 9, 2006, the Supreme Court denied certiorari review, without opinion (1051036).